Randolph BROOKS, Appellant,

v.

UNITED STATES, Appellee.

No. 80–1394.

District of Columbia Court of Appeals.

Argued Feb. 9, 1982.

Decided July 12, 1982.

---

Andrew L. Lipps, Washington, D. C., appointed by this court, with whom William J. Mertens, Public Defender Service, Washington, D. C., was on the brief, for appellant. Silas J. Wasserstrom and Ellen Kreitzberg, Public Defender Service, Washington, D. C., also entered appearances for appellant.

Richard A. Stanley, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, Michael W. Farrell, Harold L. Cushenberry, Jr., E. Thomas Roberts, Thomas C. Hill and E. Anne McKinsey, Asst. U. S. Attys.,

Washington, D. C., were on the brief, for appellee. Stanley S. Harris, U. S. Atty. and Susan R. Holmes, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Before NEWMAN, Chief Judge, and KERN and BELSON, Associate Judges.

KERN, Associate Judge:

Charged in a five-count indictment with two separate rapes and related offenses,[1] appellant was found guilty as to each count after a jury trial. This appeal followed[2] and the contentions herein are that the trial court erred in the following respects: (1) denial of appellant's motion to sever counts of the indictment; (2) exclusion of proffered expert testimony on the unreliability of eyewitness identification; and (3) failure to instruct the jury that certain evidence of inconsistent statements was admitted for impeachment only. Appellant further contends that the motions court erred in denying his motion to quash grand jury subpoenas directed to two of his alibi witnesses and that the trial court subsequently erred in permitting use of the grand jury testimony for impeachment purposes. In order to place the issues in proper perspective, we find it necessary to set forth the evidence in detail.

I

The first rape with which appellant was charged occurred on June 16, 1979. The victim was walking on Porter Street in Northwest Washington, shortly after 8:00 p. m. when a young man approached her and asked her for the time. He continued walking down the street in front of her, but returned to her two more times to ask questions about the address of a nearby apartment building and the likelihood of buses coming by. A few minutes after these contacts, the same man grabbed the complainant from behind, dragged her a short distance into the woods of Rock Creek Park, and threw her to the ground. The man warned her that he had a gun and threatened to kill her, although she did not see a weapon. He then asked her how much money she had and said that he was going to rape her.

After forcing the complainant to submit to sexual intercourse, he ordered her to kiss him and to hold him. As he continued forcible intercourse, he asked her various questions, including whether she was married, what she did for a living, whether she was a virgin, whether she had achieved an orgasm, and whether she wanted to engage in oral sex. He also remarked on the difference between their races. The assailant continued sexual intercourse with her for 30 to 40 minutes.

A few minutes before he withdrew from his victim, he told her to close her eyes and look away from him. Afterward, he said that he would take her to the side of the road where someone could help her. Rolling her over on her stomach, he tied her hands behind her with her underwear and tied her ankles with a drawstring from her dress. Before leaving, he removed her wallet, checkbook, and keys from her purse and took her watch from her wrist. Ordering her to turn her head away, he left her in the woods.

The complainant freed herself and was eventually taken to the police. She described her assailant as 5 feet 9 or 10 inches tall, with a round longish face, short hair, medium complexion, rounded eyes, wide nose and thick lips. She also noted that he had a gap between his front teeth and was carrying a beige shoulder bag. On June 28, five

1. Appellant was charged with rape, D.C.Code 1973, § 22–2801, and robbery, D.C.Code 1973, § 22–2901, in connection with an assault occurring on June 16, 1979, and rape while armed, D.C.Code 1973, §§ 22–2801, –3202, assault with intent to commit robbery while armed, D.C.Code 1973, §§ 22–501, –3202, and sodomy, D.C.Code 1973, § 22–3502, relating to events occurring on June 25, 1979.

2. Following the filing of notice of appeal, this court remanded for the limited purpose of resentencing. Appellant was resentenced on April 6, 1981, to concurrent terms of imprisonment totalling three to fifteen years.

days after the incident, the complainant identified a color slide of appellant, saying that she was 75% certain that he was the rapist. She selected appellant from a line-up the following July 3 and also identified appellant in court.

The second rape at issue occurred within ten days of the first, on the evening of June 25. The victim was walking down Reservoir Road in Northwest Washington when she noticed a young man, who was carrying an off-white shoulder bag, walking in the opposite direction. After the two had passed each other, the complainant turned and noticed him some distance behind her. When she began to run, the man ran up behind her, grabbed her around the neck and demanded money. He then held half of a pair of scissors and dragged her into the woods of Glover Archibald Park. Pushing her to the ground, he told her that she would have to engage in either normal, anal or oral intercourse, and asked if she were a virgin.

When the assailant forcibly initiated sexual intercourse, he ordered the complainant to hold him and kiss him. Throughout the intercourse, he talked to her, making remarks to the effect that women of her race were beautiful, asking whether she had ever had sex with a man of his race, asking her where she worked, and telling her not to cry or he would kill her. After approximately an hour of continued intercourse, he sodomized his victim and then again continued forcible intercourse for approximately another hour. At one point, he told the woman to close her eyes and not to look at him.

The assailant tied this second complainant's hands behind her back with her underwear as she lay face-down on the ground and tied her arm to a tree with her belt. Before he left, he told her that someone would find her and he looked through her purse, scattering its contents on the ground.

The victim untied herself and was taken to a hospital. Reporting the attack to the police, she described the rapist as 5 feet 11 inches to 6 feet 1 inch tall, with a muscular build, dark skin tone, rounded eyes, a flat nose, full lips and close-cropped hair. She also noted that he was carrying a cylindrical nylon bag. On June 27, she chose appellant's picture from a series of 300 slides as the one which most resembled her assailant and on July 3 immediately identified appellant in a lineup. She also made an in-court identification of appellant.

At trial appellant presented an alibi defense as to the charges arising from each rape. As to the first rape, he testified that he was at home on the evening of June 16. Appellant's mother, who was present at the home that evening, and his aunt, who testified that she had telephoned his home and spoken to appellant, confirmed his testimony. On the evening of June 25, appellant allegedly was with his cousins and a friend. The four men, according to appellant, drove to Suitland, Maryland, in his uncle's automobile to visit the apartment of others and left shortly after 9 p. m. in order to return his uncle's car. Other witnesses also testified in support of this alibi defense.

## II

We address first appellant's contention that the trial court abused its discretion in denying his motion for severance of the counts relating to the two separate rapes. Two or more offenses may be joined for trial if the offenses are "of the same or similar character." Super.Ct.Cr.R. 8(a); D.C.Code 1973, § 23–311(a). Appellant argues, however, that the joinder allowed the jury to cumulate the evidence in support of each offense and that the prejudice resulting from this required severance under Super.Ct.Cr.R. 14.[3]

█ It is proper to deny a motion to sever where "(1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's

---

3. Rule 14 provides that "[i]f it appears that a defendant ... is prejudiced by a joinder of offenses ... in an indictment ... or by such joinder for trial together, the court may order an election or separate trials of counts ... or provide whatever other relief justice requires ...."

mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others." *Bridges v. United States,* D.C. App., 381 A.2d 1073, 1075 (1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978). Reciprocal admissibility may be found where evidence of separate crimes is relevant to proof of motive, intent, absence of mistake, existence of a common scheme or plan, or identity. *Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964). "Other crimes" evidence is admissible on the issue of identity when circumstances surrounding each crime demonstrate that there is a reasonable probability that the same person committed both due to the concurrence of unusual and distinctive facts relating to the manner in which the crimes were committed." *Drew v. United States, supra* at 16, 331 F.2d at 90.

▮ In applying these principles to review of the denial of a motion for severance, this court will reverse only upon a clear showing that the broad discretion accorded the trial court in this regard has been abused. *Baxter v. United States,* D.C. App., 352 A.2d 383, 386 (1976); *see Bridges v. United States, supra* at 1078. Upon review of the record herein, we find that the trial court properly exercised its discretion when it ruled that the similarities in the two assaults made the conclusion that they were committed by the same person "almost inescapable," and that evidence of each rape would be mutually admissible at separate trials on the issue of identity of the rapist.

▮ The two rapes of which appellant was convicted involved a series of distinc-

tive characteristics common to both incidents, most notably, the nature of the comments made by the rapist to his victim, the length of the assault, and the use of the victim's underwear to bind her hands. We also note that the two incidents occurred nine days apart at approximately the same time of night in wooded park areas of Northwest Washington and involved young women who were walking alone and were approached in a similar manner.[4] Joined offenses need not be identical in every detail. *See, e.g., Warren v. United States,* D.C.App., 436 A.2d 821 (1981); *Bowyer v. United States,* D.C.App., 422 A.2d 973 (1980); *Bridges v. United States, supra; Arnold v. United States,* D.C.App., 358 A.2d 335 (1976) (en banc). The circumstances of each assault viewed as a whole demonstrate the strong likelihood that the same person committed both.

We are satisfied from our review of the record that the evidence of each assault involved herein would have been admissible as to the identity of the perpetrator at the separate trial of the other incident and that joinder did not work undue prejudice to appellant. *See Hackney v. United States,* D.C.App., 389 A.2d 1336, 1344 (1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979); *cf. Tinsley v. United States,* D.C.App., 368 A.2d 531, 537 (1976). Thus we conclude that the trial court did not abuse its discretion in denying severance.

### III

▮ Appellant filed a pretrial motion to admit the proffered expert testimony of a

4. We further note the following details of the similarities between the two rapes: the rapist in both instances approached the victim alone and on foot and had an opportunity to observe or speak to the victim before the assault occurred; the descriptions of the rapist provided by the two victims were similar and both included the fact that he was carrying a light-colored shoulder bag; the rapist grabbed each victim from behind; each victim was dragged into a wooded area from the street; the rapist initially indicated to each victim that he was going to rob her; only the underwear of each victim was removed during the rape; the rapist in both instances did not remove his pants; the

rapist made remarks about her race to each victim during the rape; the rapist expressed an interest in oral sex; in each instance, the rapist demanded that the victim hold and kiss him; the rapist asked each victim whether she was a virgin; the rapist asked each what sort of work she did; the penetration in both instances was lengthy; close to the end of each assault the rapist advised the victim to close her eyes and not to look at him; the rapist told each that someone would find her, but he tied each victim's hands using her underclothes and left her in a wooded area; and the rapist looked through each woman's purse after the rape.

psychology professor on the subject of "the nature of human memory and perception and the mental processes involved in an eyewitness identification." Appellant now contends that the trial court's refusal to admit this testimony was an abuse of discretion and that this court should remand for a determination of the propriety of admitting this testimony in light of the standards set forth in *Dyas v. United States*, D.C.App., 376 A.2d 827, *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977).

In *Dyas* we set forth three qualifications for the admissibility of expert testimony: (1) the subject matter "must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman* ...*"; (2) "the witness must have sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth* ...*"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." [*Id.* at 832, quoting McCormick *Evidence* § 13 at 29–31 (2d ed. 1972) (emphasis supplied by the court).]

Application of these factors in *Dyas* led us to conclude that a psychology professor's testimony on the subject of eyewitness identification was properly excluded.

■ The trial court in the present case ruled that the expert testimony would not be admitted on grounds that the subject matter was not beyond the ken of jurors in the District of Columbia, that cross-examination would adequately explore any problems or discrepancies in the victims' identifications, and that the expert testimony would serve no useful purpose. We find that the trial court's ruling that the expert testimony in question should not be admitted was in accordance with our opinion in *Dyas*. The decision as to whether expert evidence should be admitted is vested in the broad discretion of the trial court and its ruling must be sustained unless manifestly erroneous. *Salem v. United States Lines Co.*, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *Douglas v. United States*, D.C.App., 386 A.2d 289, 295 (1978); *Dyas v. United States, supra* at 831. The record reveals that defense counsel had an adequate opportunity to fully explore each victim's perception and recollection of the assault and her ability to identify the assailant. We conclude therefore that the trial court did not abuse its discretion by rejecting the proffered testimony.

## IV

At trial two of appellant's alibi witnesses, Eric Roots and Jessie Jordan, were impeached with their grand jury testimony. Both witnesses testified at trial that they drove Albert Wilkins' car to Vernon Stewart's home on the night of the second rape, June 25, whereas before the grand jury both stated that it was Jessie Jordan's car that they used. During closing argument the prosecutor referred several times to this discrepancy.[5] At the conclusion of the argument, defense counsel requested a specific instruction to the effect that the

---

5. The prosecutor argued as follows:

How about further, the story on June 25th? You saw some young men testify up on this stand and you will have a chance to evaluate their credibility. Whether you believe them, whether they appear to you to be truthful people.

Eric Roots. He got on the stand and told you a story about what happened on June 25th, did he not? But he had a little trouble with some of his facts because the critical thing to remember about this whole incident on June 25th is the fact that Al Wilkins needed his car. That's the central question. That's the key. Mr. Wilkins needed that car. Everything revolves around that because he

works at night. No question. The man works at night, he has a good job. Works at the post office. Obviously cares a great deal about Randolph Brooks, Jr. Treated him like a son.

The man was working on June 25th, and probably did. He went to work. Nobody challenges that, but the question to focusing [*sic*] in on, the celebration if it occurred on the 25th was Al Wilkins' car because Al had to have his car to go to work. He was working midnights. He had to leave by 10 or so to get to National Airport.

So Eric Roots gets off work. He claims now that when he was working in Rubin Engineering he was working with Jessie Jordan. Got off work, had a couple of beers,

impeachment testimony was not to be used as substantive evidence.[6] Appellant contends that the failure of the court to so instruct the jury was reversible error.

■ It is well-settled in this jurisdiction that prior inconsistent statements are admissible only to impeach the credibility of the witness. *See, e.g., Jefferson v. United States*, D.C.App., 328 A.2d 85, 86 n.6 (1974); *Byrd v. District of Columbia*, D.C.Mun. App., 43 A.2d 46, 48 (1945). Where there has been a request for a limiting instruction following the impeachment of a witness or the presentation of impeaching testimony and the use of the impeachment testimony as substantive evidence is potentially prejudicial, it is error for a trial court to refuse to give such an instruction. *See Towles v. United States*, D.C.App., 428 A.2d 836 (1981) (failure to give *sua sponte* limiting instruction found to be reversible error under the circumstances); *cf. Johnson v. United States*, D.C.App., 387 A.2d 1084 (1978) (en banc) (absent request for instruction, trial court not absolutely required to issue immediate cautionary instruction on limited use of impeachment testimony).

and somebody else drove him home. Some third person. Don't know where he came from, and he said in the Grand Jury on the 15th day of August, 1979, ladies and gentlemen, only weeks after this happened when it was fresh in his mind, when he put his hand and swore to tell the truth, when it was fresh in his mind. You don't forget when you drive your own car three weeks later. Say I drove my car back to Al's house. That's what he said, and Eric said that, too. It was Jessie's car.

In the Grand Jury under oath—swore under oath, and how do they get out to—how do they got out to the place in Suitland, Maryland? Was it in Al Wilkins' car? Not that day. Not the day that all of these witnesses remembered. It wasn't the birthday because, if it was, Randolph Brooks was not there.

No question, ladies and gentlemen, that probably there did come a time when Al Wilkins went to work and, indeed, Jessie Jordan, and Oink, and Eric went over [*sic*] Vernon Stewart's house and sat around and shot the breeze, and had a little reefer and had some beer, but they don't hang with Randolph Brooks, Jr. He is so much younger than they are. And could it have been the birthday? He said in the Grand Jury, "Yes, I celebrated and I got a watch."

■ Our view of the prosecutor's closing statement indicates the possibility that the references to the grand jury testimony may have been used as substantive evidence. Although we agree with the government that the focus of the prosecutor's comments was on the fact of inconsistency, the comments also suggested that the night about which Roots and Jordan were testifying was not June 25.

> Whatever night it was, if Randolph Brooks was with them, it was the night they took Jessie's car. It wasn't the 25th. They didn't have to get back because they had Jessie's car. Jessie testified to that in the Grand Jury a couple of weeks, not a year later, like it is today. [Supp. Record at 619.]

Thus the prosecutor was arguably using the impeachment testimony as substantive evidence that the events that were part of appellant's alibi for the second rape actually occurred on another night. We conclude that it was error for the trial court, following defense counsel's request, to refuse to give an instruction directing the jury to consider the grand jury testimony only in

> Now, he got on the stand, somebody must have put words in his mouth. It couldn't have been the birthday. Jessie got up in the Grand Jury along with Eric, remembered that they took Jessie's car. Whatever night it was, if Randolph Brooks was with them, it was the night they took Jessie's car. It wasn't the 25th. They didn't have to get back because they had Jessie's car. Jessie testified to that in the Grand Jury a couple of weeks, not a year later, like it is today.
>
> Yes, I took my car. Eric said the same thing. That was the testimony. And remember whatever time they got together, it couldn't have been June 25th because remember the little inconsistencies. You remember them all, probably, who was there, when and where.... It was all confused, was it not? The only thing they could remember was definitely Randolph Brooks was there. [Supp. Record II at 617–20.]

6. Specifically, counsel requested a "specific instruction from the court that [the prosecutor's] statements that it was Jessie's car that was driven that night are not supported by the evidence and there is no evidence that Jessie's car was driven that night." [Supp. Record at 622.]

regards to the credibility of the two witnesses.[7]

On the record before us, however, we find this error harmless. The thrust of the prosecutor's reference to the prior testimony was to point out the inconsistency between this and the trial testimony and hence to attack the credibility of the witnesses Roots and Jordan at trial. Moreover, these references were made in conjunction with references to numerous other inconsistencies among the trial testimony of the witnesses supporting appellant's alibi for the night of June 25.[8] The effect of the prosecutor's argument, even with the omission of references to the grand jury testimony of Roots and Jordan, would have been to cast doubt on the credibility of all the alibi witnesses and hence to point out the possibility that the events that they were testifying to did not occur on June 25. This forceful attack upon appellant's alibi defense for the second rape, considered in conjunction with the strength of the government's case against appellant, allows us to conclude with substantial certainty that the error did not sway the jury's verdict or affect substantial rights of the appellant. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

## V

We turn finally to appellant's contention that the government abused the grand jury process. During the grand jury's consideration of the two rapes, subpoenas were issued to Doris Brooks, appellant's mother, and to Albert Wilkins, both of whom were alibi witnesses at trial. Following a conversation between defense counsel and an Assistant United States Attorney which suggested to defense counsel that the purpose of summoning these two witnesses was to "lock in" their testimony,[9] appellant moved to quash the subpoenas, claiming an abuse of the grand jury process. Appellant now argues that the motions court erred in denying the motion without holding an evidentiary hearing and that the trial court erred in permitting use of the grand jury testimony for impeachment purposes.

We find no merit in these contentions. This court has held that the grand jury is "essentially independent of court control" and that "there should be no curtailment of [the grand jury's] inquisitorial power *except in the clearest cases of abuse.*" *United States v. Moultrie*, D.C. App., 340 A.2d 828, 832 (1975) (quoting *United States v. United States District Court*, 238 F.2d 713, 722 (4th Cir. 1956), *cert. denied*, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957)). The motions court heard argument on appellant's motion and concluded that it did not find "abuse, let alone that this is a clear case of abuse."

7. The trial judge stated at the bench conference regarding the requested instruction, "I think the government or the defense could draw a reasonable inference that it was or was not the car. If the witnesses had been impeached in reference to it, that there would be substantive evidence to support it." [Supp. Record at 622.] The government concedes that if the judge here was referring to the grand jury testimony as substantive evidence, this was an improper sanctioning of the use of prior testimony.

8. There were inconsistencies among the testimony of the alibi witnesses, Roots, Jordan, Blackledge, Wilkins, and appellant as to the following matters: when Blackledge arrived at appellant's uncle's house on June 25, whether Eric Roots' brother was present at the house, and whether the men ate dinner that night. The prosecutor referred to these discrepancies in his closing argument to point out that the witnesses were not accurately recalling details

of the night in question, the 25th of June. As the prosecutor concluded to the jury:

> ... based on the testimony and based on the words uttered out of the defense witnesses' mouths, they can't cover for Randolph Brooks, Jr. The stories don't hang together. [Supp. Record at 621.]

9. At hearing on the motion neither defense counsel nor the Assistant United States Attorney recalled precisely the substance of their conversation. Defense counsel stated the following:

> I asked the question, "Are you putting the witnesses in the grand jury to lock in their testimony?" That's just a sort of commonly used term—"to get the transcript of the sworn testimony?" His answer was yes. He did not say, "This was my only purpose." He did not say, "There are other purposes." [Supp. Record II at 12.]

[Supp. Record II at 24.] This conclusion was supported by the government's assertion in its opposition to the motion that these pre-indictment subpoenas were issued for valid investigatory reasons.[10] Where a legitimate purpose for the grand jury investigation predominates, as the government's opposition here demonstrated, the fact that the government may derive an incidental tactical benefit does not render the proceeding improper. *United States v. Gibbons*, 607 F.2d 1320, 1328 (10th Cir. 1979). We find no authority supporting the requirement of a full evidentiary hearing on a motion to quash.[11] Furthermore, because we agree with the motions court that there was no clear showing of abuse of the grand jury process, we conclude that the trial court did not err in permitting use of grand jury testimony at trial.

Finding no reversible error, appellant's convictions must be and hereby are

*Affirmed.*

10. The government stated the following in its opposition to the motion to quash:

It is the grand jurors' belief that either one or both of these witnesses might shed some light on the defendant's participation or lack thereof in these two rapes. The defendant may have spoken to either of these people about these rapes; these people may have observed some physical evidence or the defendant's demeanor following either rape; or either one or both of those people might be able to enlighten the grand jury as to the defendant's whereabouts on the dates of the two rapes. [Record at 27.]

11. We note that the Assistant United States Attorney who had conversed with defense counsel represented the government at the hearing and hence was available for the court's questions regarding the purpose of the subpoenas.