Robert BURRELL, Appellant,

v.

UNITED STATES, Appellee.

No. 81–1248.

District of Columbia Court of Appeals.

Argued Oct. 21, 1982.

Decided Feb. 11, 1983.

---

**1374**

W. Anthony Fitch, Public Defender Service, Washington, D.C., with whom William J. Mertens, Public Defender Service, Washington, D.C., was on briefs, for appellant.

Robert B. Lyon, Jr., Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., John A. Terry, Asst. U.S. Atty., at the time the brief was filed, and John R. Fisher and W. Randolph Teslik, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY and FERREN, Associate Judges.

KELLY, Associate Judge:

Appellant Burrell was indicted for second-degree murder[1] and was convicted of the lesser included offense of manslaughter while armed.[2] On appeal, appellant asserts that he was denied a fair trial because the prosecutor introduced evidence both of his character and of the decedent's character before the character of either man was at issue. He also claims that the trial court plainly erred in failing to instruct the jury, *sua sponte,* that it could not convict unless there was unanimous agreement as to the facts of the alleged offense. We conclude that the trial court did not err when it failed to require the jury to unanimously agree on the sequence of events that resulted in the death of the decedent. Because we find that the trial court improperly admitted the disputed evidence of appellant's character, however, we reverse and remand the case for a new trial.

---

1. D.C.Code §§ 22–2403, –3202 (1973) [recodified as D.C.Code §§ 22–2403, –3202 (1981)].

2. D.C.Code §§ 22–2403, –3202 (1973) [recodified as D.C.Code §§ 22–2405, –3202 (1981)].

## I

There was no dispute at trial that on July 6, 1979, appellant fatally stabbed the decedent, Jesse Ray, during an argument. The issue was whether appellant had acted in self-defense.

Ray, an independent home improvement contractor, had hired appellant and several other men to assist him in repairing a house in Northwest Washington. There was testimony that on July 6, 1979, before the stabbing incident, appellant and Ray had argued over money which Ray allegedly owed to appellant. Gary Clayburn, decedent's employee, testified that appellant told him that if Ray did not repay the money, he was going to kill Ray. He further testified that on two subsequent occasions that day appellant had attacked Ray with a knife, but that he and two other men had stopped appellant. Barbara Lee, appellant's daughter and the decedent's common-law wife, testified that when he returned home at about 5:00 p.m., Ray had told her that appellant had attacked him.

Clatus DeLyon, another of the decedent's employees, testified that upon completion of work on July 6, appellant and Ray traveled to Ray's house in appellant's car. As they followed in a second car, DeLyon and Lorenzo Burrell, appellant's son, watched appellant and Ray argue. After a brief stop at Ray's house, Ray, Lorenzo and DeLyon rode to appellant's apartment building in DeLyon's car.

DeLyon testified that Ray and Lorenzo Burrell got out of the car at appellant's apartment building and walked up the steps, but that only Lorenzo went inside. The two men returned to the car shortly thereafter. As they were about to leave, appellant appeared and everyone got out of the car. Appellant drew a knife and Lorenzo tried to persuade him to go back into his yard. When Ray tried to help, he and appellant started to fight. DeLyon said that from approximately fifteen feet away, he saw appellant pull a knife out of his pocket again and thrust it into the upper left side of Ray's body. Appellant then walked back toward his apartment. Ray walked into the nearby woods, picked up a piece of angle iron and walked toward appellant. As he passed within about three feet of DeLyon, DeLyon noticed that Ray was gasping for breath and had blood on his shirt. Just as appellant began to turn around, Ray hit him in the head with the angle iron. Appellant fell, and Ray also collapsed after taking a few steps.

Appellant claimed that he had stabbed the decedent in self-defense. Several of the defense witnesses were appellant's neighbors who said they had observed the altercation between appellant and the deceased. Percy Rorsh, appellant's chief witness, testified that he was at home having a cookout with his wife and friends when he heard angry words being exchanged between appellant and the deceased. Rorsh went out to the sidewalk to watch. Rorsh stated that Ray kicked appellant in the groin and that appellant who held his open knife in his left hand, struck Ray in the jaw with his right hand. Ray then ran into a nearby wooded area, picked up a "pipe," and hit appellant on the head with it as he was returning to his yard. According to Rorsh, appellant swung at Ray with his knife and stabbed him in the chest after Ray hit him. Rorsh testified that he had been turned toward Ray and had not seen any blood or tears on Ray's shirt during the struggle or when Ray came down the street with the pipe. Rorsh admitted on cross-examination that he and appellant were friends; and that appellant had attempted to give him money in exchange for false testimony, which he had refused.

The testimony of two other defense witnesses corroborated Rorsh's testimony. Both witnesses also stated that appellant had requested that they testify falsely in exchange for money and that they had refused to do so.

In its pretrial rulings, the trial court had restricted the evidence the government could present to prove the malice element of second-degree murder while armed and to rebut appellant's claim of self-defense.

It limited the government to evidence of actual threats made by the appellant against the decedent and to evidence of appellant's prior acts of violence toward the decedent. It barred any evidence of appellant's prior acts of misconduct toward persons other than the decedent.

In its case-in-chief, the government introduced evidence of the relationship between the appellant and the decedent, as well as evidence regarding both of their patterns of behavior. The prosecutor compared the behavior of appellant and that of the decedent during his opening and closing arguments and elicited testimony about their behavior from its witnesses. In opening argument, he portrayed the decedent as a compassionate and understanding individual, emphasizing that the decedent had been a good husband and father, and that he had been a hard-working small businessman. The prosecutor portrayed appellant as a jealous, hostile, and violent man. In response to his questions, Barbara Lee, appellant's daughter and the decedent's wife, testified about her father's behavior when he drank liquor[3] and her husband's peaceable nature.[4] Masella Burrell, appellant's wife, also testified about the contrasting nature of the two men.[5]

Defense counsel objected to these statements and questions on the grounds that they were impermissibly directed at showing appellant's character. In overruling the objections, the trial court stated that the type of person involved in the matter was material to the question of malice and to the question of who was likely to have been the aggressor.

## II

Appellant contends that the trial court improperly admitted prejudicial testimony to show appellant's bad character and the

3. Q. And do you recall whether [threats] would happen at any particular time?
A. Yes.
Q. When would it happen?
A. Mostly when he would be drinking.
Q. Would your father's attitude change after he had been drinking?
A. Yes.
Q. And what would be the change in attitude?
A. Without drinking he was—you could get along with him, but once he started drinking, he became violent.

4. Q. Was your husband a violent person?
A. Not to my knowledge.
* * * * * *
Q. Did you ever know him to be assaultive or to attack anyone?
A. No.
Q. For how many years were you with him?
A. Eight and a half years.
Q. How would he react after periods when your father would be threatening towards him?
A. Like I said, he never really paid him no attention. I mean, he never took him seriously.
Q. Did he ever hold a grudge?
A. No.
Q. During the periods when there would be hostility between your father and your husband, had you ever seen your husband become aggressive and not turn and walk away?
A. No, I haven't.

Q. On the other hand, during these same periods, had you ever seen your father just shake it off and turn and walk away from these arguments?
A. No, I haven't.

5. Q. Would there be particular times, Mrs. Burrell, when your husband would act more hostile towards Mr. Ray than other times?
A. A couple.
Q. And what would he be doing when he would act most hostile towards Jessie Ray?
A. Nothing. Just arguing. You know, just arguing.
Q. Would there be anything that would change his mental condition when he would act particularly hostile towards Mr. Ray? Did your husband drink?
A. Yes, he did.
Q. What would his reaction be to Mr. Ray when he drank?
A. Well, a little more than it would if he was sober.
* * * * * *
Q. Had you ever during the period when you were around Jessie and your husband, when your husband was threatening Jessie, did you ever see Jessie become aggressive towards your husband?
A. No, I haven't.
Q. Did you ever see your husband turn around and walk away from one of these fights?
A. No, I haven't.

decedent's good character despite the fact that these issues had not been raised by the defense. The government claims that the challenged evidence was presented to show appellant's prior threats and expressions of hostility toward the deceased; and that as such, it was primarily evidence of motive and intent properly admissible to prove malice, the state of mind element of second-degree murder while armed, and to contradict appellant's claim of self-defense.

It is, of course, a fundamental rule of policy that

> the prosecution may not present evidence of the defendant's (bad) character, in order to show likelihood of committing a crime, unless the defendant first places her own (good) character in issue. More specifically, the government cannot rebut a testifying defendant with evidence of her bad character (including general reputation and specific acts) unless the defendant herself has introduced good character evidence, as such; a defendant does not place her character in issue merely by taking the stand as a witness.

*Johns v. United States,* 434 A.2d 463, 468 (D.C.App.1981) (citations omitted). *Accord Michelson v. United States,* 335 U.S. 469, 475–79, 69 S.Ct. 213, 218–220, 93 L.Ed. 168 (1948); *United States v. Tomaiolo,* 249 F.2d 683, 689 (2d Cir.1957); E. CLEARY, MCCORMICK'S EVIDENCE § 191, at 454–55 (2d ed. 1972 & Supp.1978); 1 C. TORCIA, WHARTON'S CRIMINAL EVIDENCE § 229, at 489–93 (13th ed. 1972 & Supp.1981).

As we have explained:

> The reason for this rule is not that character is irrelevant; it is, rather, that the jury may put too much weight on such evidence so "as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge."

*Id.* at 468 (footnote and citations omitted).

In *Rink v. United States,* 388 A.2d 52, 56 (D.C.App.1978), we held that in a murder

trial, the testimony of witnesses concerning the appellant's threats and other expressions of hostility toward the deceased was admissible as relevant to the appellant's state of mind. We stated that evidence of a defendant's prior aggressive conduct toward a decedent is relevant when there is a claim of self-defense because "[s]uch evidence is probative of: (1) the existence of appellant's malice towards the decedent; (2) whether appellant was likely to be the aggressor in the encounter at issue; and (3) whether appellant reasonably apprehended a danger of imminent, serious bodily harm from the deceased." *Id.* at 56 (footnotes omitted); *cf. McBride v. United States,* 441 A.2d 644, 651–52 (D.C.App.1982) (a victim's threats toward a defendant who asserts self-defense are relevant and admissible under the "state of mind" exception to the hearsay rule).

We conclude, therefore, that in this case the government properly presented some evidence to prove appellant's threats and other expressions of hostility toward the decedent. However, the government also continuously compared the decedent with the appellant in a manner which highlighted their patterns of behavior far more than it described appellant's threats and other expressions of hostility toward the decedent.[6] For example, the government elicited testimony that appellant drank too much liquor; that he was hostile and combative when drinking; that he had done little or no work when he had been employed by the decedent; and that he had never apologized to his daughter for the decedent's death. The result of the government's comments and questioning was to focus the jury's attention on the forbidden question whether appellant was a "bad man" with a propensity to commit crime. Hence, the trial court admitted a good deal of character evidence[7] which did not relate to the appel-

---

6. This objectionable "evidence" included the witnesses' responses to particular questions, as well as the prosecutor's opening and closing arguments.

7. In *Michelson v. United States,* 335 U.S. 469, 477, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948), the Supreme Court defined "character evidence" as "reputation evidence" and added, "[character

lant's prior aggressive conduct toward the decedent.

If the defense had first presented evidence regarding appellant's character, the government could have rebutted such evidence with testimony about appellant's bad character. *See Johns v. United States, supra,* 434 A.2d at 468. As the defense presented no such evidence here, however, it was error to admit evidence in the government's case regarding appellant's character.

We also agree, as appellant argues, that even if he had made his character an issue, the evidence that the government introduced would have been inadmissible because it was incompetent in form. As the Circuit Court explained in *Shimon v. United States,* 122 U.S.App.D.C. 152, 156, 352 F.2d 449, 453 (1965):

> Under the *Michelson* holding, *supra,* when an accused opens the subject of his reputation by calling reputation witnesses they are restricted to what they have *heard* as to his good repute; they may not testify as to specific facts known but only general repute as an exception to the hearsay rule. The term "character" witness is, of course, a misnomer, for it is reputation not character which is then the issue. It is not what the speaker knows as to the Defendant's personal habits, character, family or business integrity but what he had heard about his reputation in this regard. It is not the substance but "the shadow his daily life has cast in his neighborhood" which is the subject of the inquiry. 335 U.S. at 477, 69 S.Ct. 213 [219]. The wisdom of this rule of law and the paradoxes it embraces are not open to us; the Supreme Court has approved these standards based perhaps not upon ideal considerations but upon difficult choices.... As we have noted it is not the truth about the man in a factual sense but his "community im-

age" which has come into issue. [Emphasis in original.]

The prosecutor presented much improper evidence regarding the appellant's personal habits and character. As noted above, there was testimony about the appellant's drinking habits, his employment record and his attitude toward the decedent and others. Moreover, the witnesses testified about their own observations and opinions of the appellant, rather than telling what they had "heard" about him.

The question then becomes whether the error in admitting evidence of the appellant's character was egregious enough to warrant reversal. The applicable test is:

> [W]hether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.

*Smith v. United States,* 315 A.2d 163, 166 (D.C.App.) (quoting *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (citations omitted)), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

Applying the above factors, we are unable to say with fair assurance that this judgment was not substantially swayed by the admission of evidence regarding the appellant's character before the appellant had put his character into issue and by the admission of the type of character evidence that the government presented. First, although there was no dispute that the appellant had stabbed and killed the decedent, there was a real question under the substantially different versions of the incident whether he had acted in self-defense. Secondly, the issue affected by the error,

---

evidence] has been well described in a different connection as 'the slow growth of months and years, the resultant picture of forgotten incidents, passing events, *habitual and daily con-*

*duct,* presumably honest because disinterested ....'" *Id.* (quoting *Badger v. Badger,* 88 N.Y. 546, 552 (1882) (emphasis added)).

the determination of who had been the aggressor, was the central issue of the case. The probative value of the evidence with regard to this issue was substantially outweighed by the risk of its prejudicial impact. The prosecutor's technique of setting up a "bad man-good man" dichotomy between the appellant and the deceased exacerbated the normal tendency to condemn a "bad man" whether or not he is guilty of the crime charged.[8] Finally, the trial court took no steps to mitigate the effects of its error such as instructing the jury to disregard the evidence that had been improperly admitted.[9]

### III

A final contention is that the trial court committed plain error by failing to instruct the jury, *sua sponte,* that if a guilty verdict was returned, the jurors had to be unanimous as to the facts of the alleged offense.[10]

The constitutional right to a unanimous jury verdict, as set forth in the Sixth Amendment to the United States Constitution and Super.Ct.Crim.R. 31(a), "requires jurors to be in substantial agreement as to just what a defendant did as a step prelimi-

nary to determining whether that defendant is guilty of the crime charged." *Johnson v. United States,* 398 A.2d 354, 369 (D.C.1979) (quoting *United States v. Gipson,* 553 F.2d 453, 457–58 (5th Cir.1977)); *Hack v. United States,* 445 A.2d 634, 641 (D.C. 1982). Several recent decisions have further defined the scope of that right. In *Hawkins v. United States,* 434 A.2d 446 (D.C.1981), we ruled that because of the possibility of a non-unanimous verdict, when one charge encompasses two separate incidents, the trial judge must instruct the jury that if a guilty verdict is returned the jurors must be unanimous as to which incident or incidents they find the defendant guilty. *Id.* at 449. The *Hack* court concluded that the trial court's error in instructing the jury about unanimity had been harmless in light of the jury's unanimous verdict with respect to one of the counts. *Hack v. United States, supra,* 445 A.2d at 641.

The facts of the instant case are substantially different from those found in our earlier cases involving the unanimity requirement. Here, the government and the defense offered different versions or theories of a single incident—the stabbing death

---

**8.** The potential for prejudice is illustrated by the following portions of the government's closing argument:

> You know the type of aggressive person Jessie Ray was. He was aggressive in the right ways. He went to work every day. He supported his family, but when conflicts arose, Jessie Ray had that God given ability to turn the other cheek and turn the other cheek he did, time and time again, when Mr. Burrell verbally abused him, physically threatened him, and generally showed the type of person that he, Robert Burrell, was.
>
> \* \* \* \* \*
>
> You know the kind of man that Jessie Ray was. And you know the kind of man Robert Burrell was. Do you recall when I asked Mrs. Burrell, the woman with whom he has lived for 33 years, whether she had ever seen her husband walk away from that type of confrontation if there was any possibility that it could continue? And she said no, she had not, that Robert Burrell was constantly aggressive.
>
> And he told you himself when he testified that after he had had a few drinks, he be-

came violent, he became aggressive and he became assaultive, and so you know the type of person Robert Burrell was long before July 6, 1979.

> \* \* \* \* \* \*
>
> Jessie time and time again would walk away. Jessie, time and time again, in the face of Mr. Burrell threatening to kill him, Jessie would turn the other cheek.
>
> He turned the other cheek on the morning of July the 6th, 1979.

**9.** Because of our disposition of this case, we need not address appellant's contention that the trial court also erred in permitting the government to present evidence of the decedent's good character before the defense had presented evidence regarding the decedent's character.

**10.** As defense counsel never objected to the trial court's failure to instruct the jury that it must be unanimous as to each fact forming the sequence of events, the plain error standard applies.

of the decedent. Appellant was charged with one crime—second-degree murder while armed—as a result of that same incident. Because there was but one offense based on a single incident and the jury had reached a unanimous verdict, we can presume that the unanimity requirement was satisfied; there was no convincing evidence to the contrary. Consequently, it was not necessary for the jury to reconstruct the fatal events step-by-step.

██ The jury was instructed on the elements of the offense and the requirement that its verdict be unanimous. In its general verdict, it found appellant guilty of the lesser included offense of manslaughter while armed. It is apparent that in reaching its decision, the jury considered the conflicting versions of the events; found that the government had not proven beyond a reasonable doubt that appellant had committed second-degree murder while armed; and rejected appellant's self-defense claim. Thus, there is no indication that the jurors did not agree unanimously that appellant was guilty of manslaughter while armed. Under these circumstances, we conclude that the trial court did not commit plain error in its treatment of the unanimity re-

quirement. *See Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).

## IV

Our conclusion is that the trial court erred in admitting evidence regarding appellant's character and that error was reversible. The court violated the general rule that the government not be permitted to present evidence regarding an appellant's character until after that appellant has made his character an issue. Moreover, the evidence that was presented failed to fall within the exception for the defendant's prior aggressive conduct toward the decedent.

We find no error, however, in the trial court's failure to instruct the jury that it must agree unanimously on the sequence of events that resulted in the death of the decedent.

*Reversed and remanded for a new trial.*