**Frank C. GORDON, a/k/a Frank Clemm, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 82–900.

District of Columbia Court of Appeals.

Argued July 8, 1983.
Decided Sept. 15, 1983.

Holly R. Skolnick, Public Defender Service with whom A. Franklin Burgess, Public Defender Service, Washington, D.C., at the time the brief was filed, was on brief, for appellant.

J. Herbie DiFonzo, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty. and Michael W. Farrell, Judith Hetherton, and Kathleen E. Voelker, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and FERREN and BELSON, Associate Judges.

**FERREN, Associate Judge:**

Appellant argues, first, that his conviction for armed robbery, D.C.Code §§ 22–2901, –3202 (1981), cannot stand because the trial court failed immediately to instruct the jury, during the government's case-in-chief, that prior inconsistent statements of the government's own witness (in this case grand jury testimony) could be considered only in evaluating whether the witness' trial testimony was credible, not to establish the truth of the prior statements. Second, appellant claims reversible error in the trial court's admission of testimony by a police officer based on the prior inconsistent statements of the government witness to the grand jury, as well as on other statements by out-of-court declarants. Finally, appellant contends he did not receive a unanimous verdict because the court instructed the jury it could find him guilty of armed robbery if it found that, at the time of the robbery, appellant had with him or readily available a pistol and/or a knife.

Because of the strength of the government's other independent evidence, as well as the trial court's instruction that the jury disregard all the hearsay testimony when the government became unable to lay the proper foundation, we can say with fair assurance that the jury verdict was not substantially swayed either by the trial court's error in not immediately giving the required limiting instruction on prior inconsistent statements, or by the police officer's hearsay testimony. We also perceive no plain error in the trial court's instruction as to unanimity. Accordingly, we affirm.

### I.

Shortly before 9:30 p.m. on October 14, 1980, Andre Townsend returned home from work after stopping to purchase two bags of groceries. Townsend drove past the intersection of Burbank and D Streets, S.E., where he noticed four or five men sitting on a retaining wall. Townsend parked his car one-half block from the intersection near his residence in the 400 block of Burbank Street, S.E. He got out of the car with his groceries and placed them on top of the car while he locked the door. Townsend turned around, only to confront "a tall guy with a gun pointed" at him who said, "Hold it." Townsend then noticed a "shorter guy" coming around from between the parked cars. The two assailants pulled Townsend across the street and up against a car. The taller one held the gun on Townsend while the shorter man searched Townsend's pockets.

After taking Townsend's wallet (containing $106 and credit cards), the taller man told him to run. Apparently fearing the armed assailant would shoot him if he ran into the open space, Townsend refused. At that point, according to Townsend's testimony at trial, "The shorter guy got aggressive." Townsend stated, "He took me by the arm and started—the only term I can think is that he gritted on me. He was going to be forceful. I was looking him dead in the face. He was going beyond robbing me and terrorizing me. He was trying to take my manhood from me. I got angry. I just stared at him."

The shorter assailant then pushed Townsend and stabbed him in the back of his thigh. The assailants grabbed Townsend's grocery bags and his car keys and fled down the hill toward the intersection of Burbank and D Streets.

Townsend reported the crime to the police. The next day he viewed a group of photographs that Police Sergeant Dyer showed him. Townsend stopped at a photograph of appellant and told Sergeant Dyer that "if the guy had a little hair on his face—I'm not talking about a full beard, but like you go a day without shaving, . . . I would give that picture a nine to ten." Consequently, the picture was shaded to simulate facial hair and Townsend stated, "That looks like him. If I could see him face to face, I would know him without a doubt."

Appellant later appeared in a lineup wearing shield number 10. Townsend identified "number 10" as the shorter of his assailants. Detective Mendez who adminis-

tered the lineup testified that Townsend identified appellant "without hesitation." Finally, Townsend identified appellant in court as the shorter man who robbed him. When the prosecutor asked Townsend how he could be certain, he replied, "I'm certain. I'm positive. I'd know him anywhere, I don't care what he do to himself. Like today, he ain't got his hair combed as he did in the lineup, but he gritted me dead in my face and his eyes and my eyes met. We ain't ever going to forget each other."

Appellant's assertions of error relate primarily to other evidence the government presented in an effort to place appellant at the scene of the crime. Sergeant Dyer testified that he responded to the scene after receiving a robbery report. At the intersection of Burbank and D Streets, Dyer interviewed three men who sat on the retaining wall: Ramseur, Harrington, and Miller. From these men, Dyer received information that a gray or light blue Mustang, bearing D.C. license tag number 644–329, had been at the intersection at the time of the offense one-half block away. At that point in Dyer's testimony, defense counsel made no objection to its hearsay nature. On cross-examination, defense counsel asked whether the three men told Dyer that they had seen what happened to Townsend. Dyer replied that the men indicated they had observed two suspects. Defense counsel continued, "They observed them doing what?" Dyer answered that Harrington observed a "light blue or silver Mustang, D.C. tags 644–329," and that Harrington described the driver and a second "taller" person. Dyer continued, "[Harrington] stated that this Mustang pulled up and stopped fast, the two subjects ran up the street and came back less than five minutes later, and they took off . . . . The two subjects were running as they came back up the street, and they were walking from where the offense occurred." Still under cross-examination, Dyer testified that Ramseur and Miller corroborated at the scene Harrington's account.

Next, the government called Viola Bennett, appellant's girlfriend. She testified that she owned a 1980 gray Mustang, D.C. tag number 644–329, in 1980. She stated that appellant had keys to her car and that he had her car on the evening of October 14, 1980.

Apparently believing Ramseur would testify that he had seen two men pull up to the intersection of Burbank and D in Bennett's Mustang shortly before the robbery, park, walk into the 400 block of Burbank, return moments later and take off in the car, the government called Ramseur as its witness. Ramseur had testified as to all these events under oath before the grand jury. When he took the stand at trial, however, he remembered only that he, Harrington, and Miller were at the intersection of Burbank and D on October 14, 1980. He did not recall that they had talked to the police; he testified he had not seen a Mustang pull up, or two men get out and then run back to the car.

The prosecutor told the trial court at a bench conference that she was surprised by Ramseur's trial testimony because it completely contradicted his grand jury testimony. She asked that the court permit her to impeach his present testimony with his grand jury testimony. The court agreed. Then, in front of the jury, Ramseur told the prosecutor that he did recall testifying before the grand jury. The prosecutor related a series of fourteen questions that Ramseur had been asked in front of the grand jury, and she repeated Ramseur's answers as they appeared in the grand jury transcript. The questions and answers involved Ramseur's observation of the Mustang and two men at Burbank and D. After each question and answer, she inquired whether Ramseur recalled the question and the stated answer; in each instance, Ramseur replied he did not. At the end of the colloquy, the prosecutor asked Ramseur if, after hearing his grand jury testimony, he recalled "seeing the Mustang that evening at the corner of D and Burbank." Ramseur testified that he did not. Neither the pros-

ecutor nor the defense counsel requested the court to instruct the jury as to the proper use of Ramseur's prior inconsistent statements.

The prosecutor later represented to the trial court that she had attempted to subpoena Miller, one of Ramseur's companions that evening, to testify at trial, but that he had not appeared. Defense counsel then moved to strike Sergeant Dyer's testimony regarding the acquisition of the license tag number as hearsay. Counsel argued that, without a witness to verify that he had seen the car and tag and reported it to Dyer, Dyer's testimony was hearsay. As the second day of the trial drew to a close, the trial court began initial discussions with counsel about what instructions the jury should receive. No one mentioned the necessity for an instruction on prior inconsistent statements.

After the close of the government's case-in-chief, the prosecutor pointed out that the court had failed after Ramseur's trial testimony to give an instruction on prior inconsistent statements. The court stated it would give one when it gave all the instructions. Defense counsel renewed his motion to strike testimony regarding the Mustang's presence in the area that night because its evidentiary foundation was entirely hearsay. The court instructed the jury to disregard Sergeant Dyer's testimony about Miller's statements that the Mustang pulled up with two men. (The court did not refer to Dyer's testimony about Harrington's and Ramseur's statements.)

In his defense, appellant testified that he had been at his grandmother's on October 14, 1980. He stated that he never had a "full beard" because he couldn't grow one— "the most I get is a shadow."

In rebuttal, the government presented appellant's grandmother who testified that he had left her apartment around "seven or after" that evening (the robbery occurred at about 9:30 p.m.).

During closing argument, the prosecutor did not mention Ramseur's testimony, the Mustang, or any of the evidence the court had stricken. She told the jury: "This case rests on whether or not you believe Andre Townsend." Defense counsel, however, raised the matter of Ramseur's testimony and said to the jury, "Now, the government says they want you to believe that what [Ramseur] said in his grand jury testimony was true."

In its final instructions, the court admonished the jury to disregard Sergeant Dyer's testimony concerning statements made to him; it also told the jury that witnesses' prior inconsistent statements are admitted for purposes of evaluating credibility and not for establishing the truth of the prior statements.

Finally, during deliberation, the jury sent a note to the courtroom:

Dear Judge,

May we please see copies (or receive facts) concerning the stipulations about the use of the automobile and/or the tag number agreed to by both counsel.

/s/ ——————————
Foreperson

The trial court responded to the jury in a note: "The testimony of Sergeant Dyer regarding the [car and its] use has been stricken and should not be considered by you." The trial court told defense counsel that this note was sufficient unless the jury further communicated because the court had "told them twice during the trial and . . . written a note saying the same thing."

The jury returned a verdict of guilty on the armed robbery charge. The court declared a mistrial on the charge of assault with a dangerous weapon, D.C.Code § 22–502 (1981), when the jury did not reach a unanimous verdict.

## II.

### A.

 In this jurisdiction, when the testimony of a party's own witness surprises that party, counsel may introduce the witness' prior inconsistent statements to

impeach the credibility of the witness.[1] Thus, prior inconsistent statements may not be used as substantive evidence of the truth of the matter asserted in the statements; they are admissible only to evaluate the witness' present truthfulness. *Brooks v. United States,* 448 A.2d 253, 259 (D.C.App. 1982). In order to reinforce this distinction for the jury, the trial court is required to give an immediate cautionary instruction when a party impeaches its own witness with prior inconsistent statements, stating that the jury may consider the prior statements only in evaluating the witness' credibility. *Coleman v. United States,* 125 U.S. App.D.C. 246, 249, 371 F.2d 343, 346 (1966), *cert. denied,* 386 U.S. 945, 87 S.Ct. 979, 17 L.Ed.2d 875 (1967), *quoted in Lofty v. United States,* 277 A.2d 99, 101 (D.C.App.1971).

When the trial court fails to caution the jury immediately, we confront the question of what effect the reviewing court must accord the error. A division of this court initially held that whenever evidence, admissible only for impeachment purposes, is unaccompanied by an immediate cautionary instruction (absent the defendant's manifest waiver of the instruction), there is plain error requiring reversal. *Lofty v. United States, supra,* 277 A.2d at 101 (quoting *United States v. McClain,* 142 U.S.App. D.C. 213, 218, 440 F.2d 241, 246 (1971)). More recently, however, this court sitting en banc reconsidered the standard by which we review the failure to give an appropriate limiting instruction. In *Johnson v. United States,* 387 A.2d 1084, 1085–86 (D.C. App.1978) (en banc), we concluded: "*Lofty* unnecessarily and inappropriately broadened the scope of the plain error rule." *Id.* at 1086. In attempting to encourage counsel's timely exceptions to trial errors, we overruled *Lofty* to the extent it absolutely obliged the trial court, sua sponte, to issue an immediate cautionary instruction whenever evidence is admissible only for a limited purpose. *Id.* at 1087.

*Johnson,* however, presented a specific factual situation of the government's impeachment of a defense witness with the witness' prior inconsistent statements. 387 A.2d at 1085. At that point, we stated: "We intend no violence to, and reaffirm the validity of *Lofty's* narrower holding that a sua sponte cautioning instruction is required when a party, *surprised by its own witness,* impeaches the witness with a prior inconsistent statement." *Id.* at 1087 n. 5 (citations omitted) (emphasis added).

█ After the en banc *Johnson* decision, a division of the court considered whether the failure to give a *Lofty* instruction, as reaffirmed in *Johnson,* requires automatic reversal or, instead, a case-by-case review of the record. *Lucas v. United States,* 436 A.2d 1282, 1284 (D.C.App.1981). Guided by the statutory mandate that this court render judgment without regard to errors that do not affect the substantial rights of the parties, D.C.Code § 11–721(e) (1981), we held in *Lucas* that when the trial court fails to give the *Lofty* instruction, this court is not obliged automatically to reverse; rather, we must review the record to ascertain whether we can say with fair assurance that the verdict was not substantially swayed by the error. *Lucas, supra,* 436 A.2d at 1284–85 (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

### B.

After reviewing the record, we conclude that the trial court's error in failing to give

---

1. D.C.Code § 14–102 (1981). Impeachment of own witness; surprise.

 When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness had made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause. Before such proof is given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made the statements and if so allowed to explain them.

an immediate cautionary instruction was harmless; it did not affect appellant's substantial rights. Apart from any of the evidence regarding Ramseur's (or Miller's or Harrington's) placement of the Mustang and the suspects at the scene, the government had a strong case against appellant. Townsend and appellant engaged in a memorable confrontation; Townsend's testimony presented evidence from which a jury could be convinced beyond a reasonable doubt that appellant was Townsend's assailant. Moreover, appellant wavered as to the times for which he claimed an alibi. In rebuttal, the government reaffirmed his inconsistency by calling appellant's alibi witness—his grandmother—who testified that appellant left her house at a time making it possible for him to commit the offense.

■ Although not immediately instructing the jury that Ramseur's grand jury testimony was admitted only to impeach his trial testimony, the trial court did include that instruction in its final charge. Moreover, the prosecutor made no reference to Ramseur's grand jury testimony after Ramseur left the witness stand; in closing, she told the jury that the case rested entirely on Townsend's identification. Taken as a whole, the strength of the government's case, the trial court's final instruction, and the absence of improper use by the government of its witness' prior inconsistent statements rendered harmless the court's failure to issue sua sponte the required cautionary instruction.[2]

### III.

Appellant contends, further, that the cumulative effect of the evidence of the Mustang's presence at the scene, and of appellant's association with the Mustang that night, was so prejudicial that reversal is required. He argues that, because of the use of Ramseur's prior inconsistent statements and Sergeant Dyer's hearsay testimony, no "competent substantive evidence" ever connected the car to the robbery.

Recapitulating the references to the Mustang heard by the jury, we have, first, the prosecutor's opening statement. She told the jury that she expected to present a witness (Ramseur) who would testify about

---

2. If the jury erroneously considered the substance of Ramseur's grand jury testimony, we *would hesitate to conclude that the testimony was more untrustworthy than probative.*

The rule against using an out-of-court statement to establish the truth of the matter asserted is designed to ensure reliable evidence by requiring: statements introduced at trial to be made under oath; the declarant's personal presence at trial (in order that the factfinder may observe the declarant's demeanor); and an opportunity for cross-examination. There are many exceptions to the hearsay rule, however, because of a perceived need for otherwise trustworthy and relevant testimony.

In many jurisdictions, prior inconsistent statements, made under oath by a declarant testifying at trial (and thus available for cross-examination), may be admitted to prove the truth of the matter asserted. FED.R.EVID. 801(d)(1)(A), *cited in United States v. Campbell,* 221 U.S.App.D.C. 367, 372 n. 7, 684 F.2d 141, 146 n. 7 (1982). The justification is that previously sworn statements (made under penalty of perjury) that are inconsistent with the testimony of a witness available for cross-examination have sufficient indicia of reliability for use as substantive evidence. *See Ohio v. Roberts,* 448 U.S. 56, 66–73, 100 S.Ct. 2531,

2539–2542, 65 L.Ed.2d 597 (1980) (witness' prior testimony at preliminary hearing bears sufficient indicia of reliability to be constitutionally admissible; hearsay evidence may be admissible with showing of particularized guarantees of trustworthiness); MCCORMICK ON EVIDENCE, § 251 at 603–04 (2d ed. 1972) ("it is hard to escape the view that evidence of a previous inconsistent statement, when declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony"); *see generally Parker v. United States,* 363 A.2d 975, 977–78 (D.C.App.1976) (dicta).

Furthermore, a party who presents a witness and then is surprised by the testimony does not present prior inconsistent statements as its preferred evidence. The factfinder can evaluate for itself the weight to attribute to statements made by a vacillating witness.

Although we are aware of the legislative mandate in this jurisdiction, D.C.Code § 14–102 (1981), see note 1 *supra,* to restrict the use of prior inconsistent statements by a party's own witness to impeachment of that witness, we note that the "indicia of reliability" in such evidence support the conclusion that the trial court's error in failing to give an immediate cautionary instruction here is harmless.

the presence of a Mustang bearing D.C. tag number 644–329 at the scene, and that she expected the evidence to show that appellant's fiancée owned that Mustang. Second, Sergeant Dyer testified that three men in the area—Harrington, Ramseur, and Miller—told him they had seen the Mustang. Upon defense counsel's explicit cross-examination, Dyer confirmed the men's complete report of the Mustang and its occupants. Third, appellant's girlfriend, Viola Bennett, testified that appellant drove the Mustang that evening. Finally, the prosecutor, expecting Ramseur to repeat the substance of his grand jury testimony, called Ramseur to tie the evidence to the case against appellant by laying the foundation of his personal knowledge that the Mustang was at the scene. As it turned out, Ramseur denied on the stand that he had seen any relevant events that evening and thus did not connect the previously offered evidence. His grand jury testimony—which did provide the connection—was recounted to impeach his credibility. The prosecutor did not further comment on the Mustang evidence; she specifically told the jury to decide the case on the strength of Townsend's identification.

The trial court instructed the jury—during trial and in final instructions—to disregard Dyer's testimony and the comments made to him "dealing with the license plate and a description of how the car came up, two people got out of the car and came back." During deliberation, the jury inquired "about the use of the automobile and/or the tag number." The court instructed the jury to disregard Dyer's testimony.

■ Doubtless there was testimony without a sufficient evidentiary basis in front of the jury. When the unexpected lack of foundation became apparent, appellant moved to strike the evidence (he did not move for a mistrial). The court instructed the jury to disregard Dyer's testimony and to consider Ramseur's grand jury testimony for impeachment purposes only. The court did not specifically instruct the jury to disregard Bennett's testimony, but it did tell the jury to "toss from their minds" the comments about the car. The court also told the jury that statements of counsel are not evidence. The jury's note during deliberations, while evincing a lack of clarity as to what evidence should be disregarded, did reflect that the jury understood it could consider some evidence only for a limited purpose. The court responded by telling the jury to disregard Dyer's testimony. Given the strength of the government's case apart from the Mustang evidence, the prosecutor's avoidance of the evidence when she realized it lacked a foundation,[3] the trial court's instructions to disregard the evidence,[4] and the jury's apparent readiness to limit its use of evidence to the appropriate purpose, we conclude that the original introduction of the unconnected evidence did not affect appellant's substantial rights.

## IV.

■ Appellant maintains that he did not receive a unanimous jury verdict because the trial court instructed the jury it could find appellant guilty of armed robbery if it found that, at the time the offense was committed, appellant was armed with or had readily available a pistol and/or a knife. Townsend testified at trial that appellant's accomplice had a pistol and that appellant stabbed Townsend with a sharp object. Appellant now complains that lack of jury unanimity was possible because some jurors could convict on the basis of his accomplice's pistol, while others could convict because appellant had a knife.

The unanimous verdict requirement ensures that jurors are "in substantial agree-

---

3. We note that defense counsel, in closing argument, was the one who reminded the jury of Ramseur's grand jury testimony, stating that the government "want[s] you to believe ... his grand jury testimony was true."

4. It was defense counsel's thorough cross-examination of Dyer that brought out the substance of Dyer's report: the witnesses' description of the two men and their actions.

ment as to just what a defendant did as a preliminary to determining whether that defendant is guilty of the crime charged." *Johnson v. United States,* 398 A.2d 354, 369 (D.C.App.1979) (citation omitted). Unlike cases involving one conviction arising from two separate incidents (where the trial judge must instruct the jury that, if it returns a guilty verdict on one charge, it must be unanimous as to the offending incident), this case involved a single incident. *See Hack v. United States,* 445 A.2d 634, 641 (D.C.App.1982); *Hawkins v. United States,* 434 A.2d 446, 449 (D.C.App.1981); *Johnson, supra,* 398 A.2d 354. Indeed, this case involved only one version (Townsend's) of a single incident. *Cf. Burrell v. United States,* 455 A.2d 1373, 1379 (D.C.App.1983) (unanimity presumed when jury instructed generally to return unanimous verdict and charge was based on single incident where "the government and the defense offered different versions or theories of a single incident").

In addition to instructing that the jury could convict of armed robbery if it found that appellant was armed with or had readily available a pistol and/or a knife, the trial court instructed the jury to consider separately each alleged offense (the armed robbery and the assault) and the applicable evidence, and to return a unanimous verdict. At the time the court gave its instructions, appellant did not object to them either as to the offenses themselves or as to the required unanimity. Since he raises this objection for the first time on appeal, we review only for plain error. *See Watts v. United States,* 362 A.2d 706, 709 (D.C. App.1976) (en banc).

Because the jury returned a unanimous verdict that appellant was guilty of armed robbery based on one incident, and there is no convincing evidence that the jury was not in substantial agreement about appellant's actions, we conclude the trial court did not plainly err in its treatment of the unanimity requirement. *See Burrell, supra,* 455 A.2d at 1380. The fact that the jury did not reach a unanimous verdict on the

assault with a deadly weapon charge, resulting in a mistrial on that count, is not convincing to the contrary. That charge would have required the jury to make a wholly separate finding, beyond a reasonable doubt, that appellant attempted to or did injure Townsend with the sharp object, whereas the armed robbery count requires a finding that an armed accused took property from the victim by force or fear.

*Affirmed.*

NEWMAN, Chief Judge, dissenting:

Footnote five in *Johnson v. United States,* 387 A.2d 1084 (D.C.App.1978), expressly affirms this court's support for *Lofty's* narrow holding, that a sua sponte cautioning instruction is required when a party, surprised by its own witness, impeaches the witness with a prior inconsistent statement in accordance with D.C. Code § 14–102 (1973). To hold, without going en banc, that a per se reversal is not mandated when such a cautioning instruction is omitted is a violation of *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.App.1971). Accordingly, I must dissent.