DeAngelo A. GREEN and Thomas
B. Landon, Appellants,

v.

UNITED STATES, Appellee.

Nos. 94–CF–97 & 94–CF–535

District of Columbia Court of Appeals.

Argued March 12, 1998.

Decided Sept. 3, 1998.

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein and Ira Mickenberg, Public Defender Service, were on the brief, for appellant Green.

Judith A. Lovelace, appointed by the court, for appellant Landon.

Helen M. Bollwerk, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher, Mary Patrice Brown and Lisa A. Prager, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN and FARRELL, Associate Judges, and PRYOR, Senior Judge.

STEADMAN, Associate Judge:

DeAngelo "Man" Green and Thomas "Bernard" Landon, together with a third individual who was tried separately,[1] plotted and carried out on the night of April 10, 1991, a plan to rob and kill a local drug dealer and, in the process, seriously wounded the drug dealer's associate. Their first trial resulted in a mistrial when the jury was unable to reach a verdict. On retrial, each appellant was convicted of first-degree premeditated murder while armed and thirteen other counts.[2]

Both appellants forcefully argue that the trial court erred in excluding expert testimony about the reliability (or lack thereof) of eyewitness identifications. Appellant Green further contends that the trial court erred in admitting evidence of an eyewitness's pretrial identification from a photo array where the witness could not say which of two photos (picked from an array of ten photos) was Green. Appellant Landon further contends that the trial court gave an erroneous jury instruction on the elements of conspiracy.[3] We find no basis for reversal in any of the appellants' contentions. We remand solely for the purpose of allowing the trial court to vacate certain merging convictions and resentence accordingly.

## I. THE FACTS.

The facts, as the jury could reasonably have found them, are somewhat complex and involve a number of individuals. We therefore break down the following statement of facts into smaller, roughly chronological units for greater ease of reference.

### A. The Conspiracy.

In late March or early April of 1991, appellants were overheard discussing Green's plan to rob and kill a drug dealer, Juan McWeay.

---

1. This individual, Grant Moctar, who had been indicted along with appellants, was likewise convicted at his trial and has a direct appeal pending before us, also decided by opinion released today. See Moctar v. United States, 718 A.2d 1063 (D.C.1998).

2. Specifically, the other counts were conspiracy to commit robbery, armed robbery, two counts of armed kidnapping with intent to steal, two counts of armed kidnapping with intent to assault, second-degree armed burglary, armed mayhem, assault with intent to kill while armed ("AWIKWA"), three counts of first-degree felony murder while armed, and possession of a firearm during a crime of violence ("PFCV"). The crimes are defined in D.C.Code §§ 22–105a (conspiracy), –2901 and –3202 (armed robbery), –2101 and –3202 (armed kidnapping), –1801(b) and –3202 (second degree armed burglary), –506

and –3202 (armed mayhem), –501 and –3202 (AWIKWA), –2401 and –3202 (premeditated and felony murder while armed), and –3204(b) (PFCV) (1996).

3. Landon also presents a range of added grounds for reversal; viz., that (1) the trial court gave an erroneous jury instruction on reasonable doubt, (2) the trial court should have interrupted the prosecutor, sua sponte, during her opening statement and closing argument for allegedly misstating the evidence, (3) the trial court erroneously admitted the grand jury testimony of Landon's grandmother for impeachment purposes, (4) the trial court should have allowed Landon the opportunity to recross-examine a witness or, alternatively, should have granted his motion for a mistrial, and (5) there was insufficient evidence as to all fourteen of Landon's convictions.

Anna Rose overheard such a conversation in the living room of her apartment, which was located in the same building as an apartment shared by Landon's cousin, named John McNeil, and Green's cousin. As Rose recalled, Green explained to Landon that they should order cocaine from McWeay and then rob him when he tried to deliver the drugs. Rose noticed two guns on her kitchen table and asked about them. Green explained that one was a "9 millimeter, and the other one was a 357," and that he intended "to use the 9 millimeter to kill [McWeay] because that had more power." Green added that "if the white boy was with him, he had to be killed too." Landon expressed his agreement with the plan by saying, "Yes, Man, that's the way to do it. We can do it that way."

A few days later, the appellants returned to Rose's living room with Grant Moctar to continue their discussion. As they talked, Rose recalled, McNeil knocked on her door to tell Green that McWeay was waiting downstairs. Green then left the apartment. Through her window, Rose saw him confer with McWeay near McWeay's white Corvette. Green returned to the apartment and announced that McWeay agreed to "score him an eighth of cocaine." Landon replied, "[T]hat's good. At least we'll be able to get to him." Green suggested that they conceal their faces with black masks when they robbed McWeay, and both Landon and Moctar agreed. They would have to be prepared to kill McWeay during the robbery, Green reminded the others, to which Landon replied, "Yeah, Man, that's the way it has to go." Two other witnesses, Donald Barkley[4] and Ronald Pinkney, heard Green explain his plan to Landon on other occasions, but they did not hear Landon say anything in response.

### B. The Robbery and Kidnapping of Juan McWeay.

On the night of April 10, 1991, Moctar enlisted a sixteen-year-old friend, Rodney Givens, to drive Moctar and the appellants from a gas station in Montgomery County, Maryland, to the District of Columbia. Moctar and the appellants offered to pay for gasoline in exchange for the ride. The appellants rode in the back seat of Givens's beige Oldsmobile and directed him to another gas station at the corner of Sherman Avenue and Harvard Street, N.W. Givens and Moctar stayed in the car while the appellants stepped out for a few minutes.

Meanwhile, Barkley drove his mint green 1991 Chevrolet Blazer north on Sherman Avenue toward Harvard Street. Barkley heard someone call out his name and saw Landon hail him from the curb. Barkley pulled over near the gas station at the corner of Sherman and Harvard, and both appellants approached the Blazer. Barkley asked Landon for some cocaine. Landon replied that he did not have any, but that he expected to get some soon. Landon elaborated that he and Green "were waiting for Juan and ... were going to rob him." Landon also invited Barkley to stay and "[w]atch my work." If Barkley would agree to "wait and drop them at home," Landon promised, then "they would give [him] some cocaine." Barkley agreed and parked on the opposite side of Sherman Avenue, where he waited with his passenger, Robert Brown. The appellants returned to the back seat of Givens's Oldsmobile.

Within ten minutes, McWeay's Corvette pulled into the gas station. McWeay rode in the passenger seat, and Ralph Cherrico drove. Cherrico, who is white, appears to have been the "white boy" Green expected to accompany McWeay. The appellants and Moctar again got out of the Oldsmobile, walked toward the Corvette, and removed McWeay. There was a brief scuffle outside the Corvette. At some point, Green ran to Barkley's Blazer, displayed a nine-millimeter handgun, and demanded the vehicle. Barkley and Brown surrendered the Blazer and Green drove it into the gas station. Green hopped out of the Blazer, forced McWeay into Givens's Oldsmobile, got into the car himself, pointed a gun at Givens, and ordered him to drive off. Givens heard McWeay plead, "[D]on't kill me," as Givens drove back into Montgomery County, Maryland. Green

---

4. Barkley was related to Landon by marriage and knew both appellants. As will be related in the next section, he ended up getting much involved in the events of April 10.

told Givens to stop at a location near Landon's apartment. Once there, Green took McWeay out of the car and told Givens to leave.

## C. The Kidnapping of Cherrico and the Burglary of His Apartment.

Back at the gas station, Moctar had climbed into the passenger seat of the Corvette, displayed a gun, and demanded drugs or money from Cherrico. Cherrico said that he had neither, and Moctar ordered him to drive off. As Cherrico pulled out of the gas station, he was passed by the beige Oldsmobile carrying McWeay in the back seat. Cherrico also saw a Blazer following him in the rear view mirror; Barkley confirmed that someone driving his Blazer followed the Corvette out of the station.

Cherrico drove to his own apartment near 9th and M Streets, N.W., because he kept cash there with which he hoped to pay off Moctar. The Blazer parked behind Cherrico, and, although Cherrico testified that he never got a good look at the driver, he described the driver as a dark-skinned black man who followed him and Moctar upstairs to the apartment. Moctar hid his gun in his jacket as they passed the building's security guard. All three men entered Cherrico's apartment, and Moctar again demanded drugs or money. Cherrico gave Moctar $850 cash. Moctar continued to demand more money or drugs and threatened to kill Cherrico. Meanwhile, the driver of the Blazer went from room to room, apparently looking for loot. Moctar and the driver of the Blazer then escorted Cherrico out of the apartment and back into the Corvette. When they left, Cherrico noticed that the apartment was in its normal condition.

## D. The Mayhem and AWIKWA.

Moctar ordered Cherrico to drive into an alley and, once again, they were followed by the Blazer. When both vehicles reached the alley, Moctar got out of the Corvette and ordered Cherrico to get out, too. The driver of the Blazer also had stepped out of his vehicle and into the alley and approached

Cherrico. At around 12:45 a.m. on April 11, 1991, Moctar shot Cherrico in the head. A police officer in the vicinity of 14th and Newton Streets, N.W., heard the shot and promptly responded to a radio run for a shooting in the alley behind the 1300 block of Kenyon Street, N.W. He entered the alley and found Cherrico bleeding from a gunshot wound to the head. The officer followed a trail of blood from Cherrico to a .380 caliber shell casing.

Cherrico survived the shooting, but all four of his limbs were affected by paralysis and he has trouble speaking and reasoning. Within two years he was able to walk again, albeit with a limp, but he lost the ability to perform basic arithmetic and, although he was right-handed before the shooting, he could no longer write with that hand. At trial, a doctor testified that Cherrico would never regain the full use of his arms and legs and that he would always have difficulty speaking and performing cognitive functions.

## E. Interlude.

At approximately 1:00 a.m. on April 11, a neighbor heard banging at the door to Cherrico's apartment. The neighbor looked through his peep hole and saw three black men in the process of entering the apartment. The neighbor was certain that Cherrico was not among the men. Police investigators later took photographs of the apartment showing that it had been ransacked, including a couch. According to Cherrico, McWeay had stashed a package of cocaine in that couch a few days earlier. Cherrico later testified that he had not told his captors about the stash when they first demanded drugs or money because he was so frightened that he forgot about it.

## F. The Death of Juan McWeay.

An officer with the Metropolitan Police Department ("MPD") Mobile Crime Laboratory pulled into a gas station at the corner of Georgia and New Hampshire Avenues, N.W., at around 2:30 a.m. on April 11. He found McWeay's body lying face up near a bank of pay telephones.[5] McWeay had been shot

---

**5.** McWeay's precise time of death is unclear. A stipulation read into evidence placed the time of

three times in the back. The receiver to one of the telephones was dangling off the hook, and the officer noticed a bullet hole or impression in the telephone unit. The officer found a total of four nine-millimeter shell casings and two nine-millimeter slugs near McWeay's body.

### G. The Chase by the Police.

Some forty-five minutes before McWeay's body was discovered, Special Agent James Cooke of the Bureau of Alcohol, Tobacco and Firearms was driving a patrol van with an MPD officer as part of a combined federal-local law enforcement task force. Cooke saw a man he later identified as Landon walk out of an alley and cross the 400 block of Ingraham Street, N.W., to a green Blazer, where two other men stood at the open driver- and passenger-side doors. Cooke noticed Landon because he resembled a suspect in an unrelated shooting. The three men entered the Blazer and drove off. Cooke followed the Blazer through the Northwest and Northeast sections of Washington. After Cooke activated the van's emergency lights, the Blazer stopped for a moment on Oglethorpe Street, N.E. Later that morning, police returned to that portion of the street and found the nine-millimeter semi-automatic Beretta pistol that killed McWeay.

The Blazer sped off again, and the chase proceeded into Maryland. At one point, the Blazer's front passenger, who wore a distinctive leather jacket and brandished a pistol, opened his door and nearly fell from the vehicle. The pistol fell to the ground as Landon helped the passenger back into the Blazer. Then the two of them jumped from the Blazer and fled by foot. They were pursued by Agent Cooke's partner, the MPD officer, but they escaped. Cooke continued to follow the Blazer until its driver also jumped out and escaped in the same direction as the other two suspects. Cooke then returned to where the pistol fell, and he recovered the .380 caliber semi-automatic pistol that was used to shoot Cherrico. Oth-

er officers searched the area where the three suspects fled and recovered a leather jacket, which Cooke identified as the same jacket worn by the Blazer's front passenger; at trial, Barkley identified the jacket as the one he believed Green was wearing that night. The jacket pockets contained McWeay's pager, the keys to McWeay's Corvette, and Cherrico's gold herringbone necklace, which he kept in a drawer in his apartment. Police technicians recovered the appellants' fingerprints from the inside of the Blazer, but they could not recover fingerprints from either of the guns.

### H. Denouement.

After Green had taken his Blazer, Barkley walked with Brown down Sherman Avenue. Brown called his employer and received a ride home from him, while Barkley walked to McNeil's apartment [6] where he waited until the next morning. At about 6:00 a.m., Green and Moctar arrived at the apartment. Barkley asked what happened to his vehicle. Green told him to report it stolen, and Barkley did so. That night, however, after Barkley saw a television news broadcast reporting McWeay's death, he went to the police and gave a written statement of what he knew about the planned robbery. From the MPD Homicide Branch downtown, Barkley telephoned Landon to ask what happened to the Blazer; a detective monitored this call. Landon said not to worry about the Blazer and promised to give Barkley money. Landon added, "Just don't say anything to the police."

Between 9:00 and 10:00 p.m. on April 11, Ronald Pinkney arrived at Landon's apartment in suburban Maryland. Landon paid Pinkney $20 to don a pair of gloves and remove the license plates from McWeay's white Corvette, which was parked outside. Pinkney broke the license plates into small pieces and disposed of them in Landon's kitchen trash can. Green telephoned Landon's apartment at least twice during Pink-

---

death at some time during the "early morning hours" of April 11.

**6.** As noted above, this was in the same building as the apartment in which Anna Rose overheard

appellants plotting the robbery and murder. McNeil was Landon's cousin and shared the apartment with a cousin of Green's.

ney's visit. Pinkney overheard Landon complain to Green that his legs were scarred from jumping out of the Blazer and that he was tired from running from the police. Pinkney's recollection was that Landon told the following story: Green shot Cherrico in the head, and then Landon and Moctar drove McWeay in the Blazer to an apartment, where Landon shot McWeay and stole a kilogram of cocaine. Pinkney also heard Landon say that Moctar wiped their fingerprints off the guns before throwing them out of the Blazer.

Using the information supplied by Barkley, the MPD requested the assistance of Montgomery County authorities to stake out Landon's apartment building. Montgomery County police arrested Green and Pinkney outside the building on April 12, 1991. Landon was arrested later that day. McWeay's Corvette was still parked outside the building, and police found McWeay's broken license plates in Landon's kitchen trash. Police also recovered over ninety grams of crack cocaine, valued at $4,500, from a broiler pan in Landon's kitchen.

## II. GIVEN'S IDENTIFICATIONS OF APPELLANT GREEN.

In April of 1993, about one week before appellants' first trial, Givens was shown an array of ten photographs and asked to identify the man whom he drove with McWeay away from the Sherman Avenue gas station. Givens selected two photos from the array and stated that one of the two was the perpetrator. One of these pictures depicted appellant Green.

In a voir dire before the first trial, Givens stated that he did not see in the courtroom either of the men who rode in his car with Moctar, even though both appellants were present. During direct testimony in the first trial, Givens was asked whether he saw either of the men and again said that he did not. Over objection, however, Givens testified about his selection of the two photos from the array.

Still at the first trial, counsel for Green cross-examined Givens about his failure to identify the suspects during voir dire. When asked whether the appellants had been seated at the defense table during the voir dire, Givens craned his neck and responded that he "didn't see anybody sitting back there." The prosecutor, on redirect examination, suggested that something was blocking Givens's view from the witness box. At a bench conference, the trial judge confirmed that he, too, had observed Givens crane his neck in an effort to see the people seated at counsel table when asked to look in that direction by Green's lawyer. The trial court excused the jury and conducted a voir dire of Givens to determine where he was able to see from his seat in the witness box. When the trial judge asked Givens why he had "leaned forward and looked up and over the corner of the bench" during cross-examination, he answered, "To see who [defense counsel] was talking about." Givens explained that the only person he could comfortably see at the defense table was counsel for Landon. The trial court determined that the bench had blocked Givens's view of the appellants and allowed the prosecutor to try again to elicit an in-court identification on redirect examination. The jury returned to the courtroom. Givens then identified Green and explained his failure to do so on direct examination.

In the second trial, Givens again testified about the identification from the photo array. The prosecutor also asked him "to stand up and look around the courtroom and see if you see the person in this courtroom who told you to drive that car at gunpoint that night." Givens identified appellant Green. He was cross-examined extensively about his failure to identify Green in the earlier proceedings. The trial court also allowed the jurors to sit in the witness box to help them evaluate Givens's explanation that his view had been obstructed.

## III. EXPERT TESTIMONY OF EYEWITNESS IDENTIFICATIONS.

Appellants contend that the trial court erred in excluding the proffered expert testimony of Dr. Steven Penrod, a university professor who has published extensively on the reliability *vel non* of eyewitness identifications. This proffer was made chiefly by

appellant Green in order to challenge his identification by Givens.

## A. Standard of Review.

 As we have often reiterated in a number of contexts, "[t]he admission of expert testimony is committed to the broad discretion of the trial court and a ruling either admitting or excluding such evidence will not be disturbed unless 'manifestly erroneous.'" *Dyas v. United States*, 376 A.2d 827, 831 (D.C.1977) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)); *accord, e.g., Eason v. United States*, 687 A.2d 922, 925 (D.C.1996), *aff'd in pertinent part*, 704 A.2d 284, 285 (D.C.1997) (en banc) (per curiam); *In re Melton*, 597 A.2d 892, 897 (D.C.1991) (en banc). In *Dyas*, we identified three criteria for the admissibility of expert testimony:

> (1) the subject matter "must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman*"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth*"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert."

376 A.2d at 832 (quoting McCORMICK ON EVIDENCE § 13, at 29–31 (E. Cleary ed., 2d ed.1972)) (emphasis in original). In *Dyas* and its progeny, we have consistently upheld decisions to exclude expert testimony about the reliability of eyewitness identifications as within the trial court's broad discretion. *See Taylor v. United States*, 451 A.2d 859, 866–67 (D.C.1982); *Brooks v. United States*, 448 A.2d 253, 257–58 (D.C.1982); *Jackson v. United States*, 420 A.2d 1202, 1203 n. 2 (D.C. 1979) (en banc); *(Michael) Smith v. United*

*States*, 389 A.2d 1356, 1358–59 (D.C.1978) (per curiam); *Dyas, supra*, 376 A.2d at 832.

Appellants agree that abuse of discretion remains the standard, but they suggest that trial courts have come to interpret *Dyas* as articulating a rule that such testimony is per se inadmissible.[7] To address that concern, we pause to say a few more words about *Dyas*.

It may be useful to recall the facts of *Dyas*. It involved an outdoor robbery at gunpoint on a clear afternoon in which the witness had "no impediments to his observation of [the defendant] during the two or three minutes they were confronting each other at a distance of three feet." 376 A.2d at 830. He gave a "detailed and essentially accurate" description of the defendant at the crime scene. *Id.* The witness identified the defendant as the robber in a photo array and subsequent line-up within two weeks of the robbery.[8] *See id.* The proffered testimony of the expert witness in its specifics would have stated that "scientific literature" supports the conclusions that (1) one under stress does not make observations as accurately as one not under stress; (2) "within hours after a criminal episode the ability to remember details begins to rapidly decline"; and (3) "once a person publicly announces an opinion he will be motivated to maintain it despite the existence of subsequent, contrary evidence." *Id.* at 831. Under these circumstances, we were persuaded that the trial court did not abuse its discretion in excluding the proffered testimony since its subject matter was "not beyond the ken of the average layman" nor would such testimony "aid the trier in a search for the truth," and that counsel through effective cross-examination would be able to sufficiently present to the jury any inconsistencies or deficiencies in the eyewitness testimony. *See id.* at 832.

---

7. Indeed, the trial court, during a colloquy before ruling on the defense motion, observed that "the three leading cases, *Dyas, ... Brooks* and *Taylor*, all seem to suggest that this type of evidence is not admissible." We note that in its actual ruling, however, the trial court clearly understood that it was exercising a discretionary call.

8. The photo array was deemed unnecessarily suggestive because the defendant was the only person in the array with an earring, which the witness had described the robber as wearing. We upheld the trial court's determination that the identification was sufficiently reliable to permit the admission of the line-up and in-court identifications. *See* 376 A.2d at 829–30.

■ The *Dyas* case and its progeny simply upheld discretionary calls by the trial court in the circumstances presented. *Dyas* does not exclude expert testimony about the reliability of eyewitness identification for all purposes and under all circumstances, even where a trial court, in its discretion, believes the jurors might find such testimony truly helpful. Conversely, a determination by the trial court excluding such testimony as not "beyond the ken of the average layman" is a ruling only that upon the particular proffer made and in the concrete setting of that case, the possible assistance of the expert testimony to the jury is insufficient to outweigh the potential for distracting the jury or supplanting its customary role in evaluating credibility. Under *Dyas,* as under any case concerning the admissibility of expert testimony, we will review the trial court's decision for abuse of discretion, whether the trial court admits or excludes the proffered testimony. *See Oliver v. United States,* 711 A.2d 70, 73 (D.C.1998) (per curiam) ("It is well established that a trial judge has broad discretion to admit or exclude expert testimony, and that a decision either way should be affirmed unless it is manifestly erroneous.") (quoting *Spencer v. United States,* 688 A.2d 412, 417 (D.C.1997)); *cf. General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997) ("A court of appeals applying 'abuse of discretion' review to such rulings may not categorically distinguish between rulings allowing expert testimony and rulings which disallow it.").

■ In other words, *Dyas* and its progeny do not articulate a per se requirement that all expert testimony about the reliability of eyewitness identification must be excluded.[9] Surely it would be unnecessary and undesirable to present expert testimony in each and every case involving eyewitnesses,[10] but

there may be cases in which a jury would find such testimony helpful. Under the abuse-of-discretion standard applicable here, however, we cannot say that the trial court's exclusion of Dr. Penrod's testimony was manifestly erroneous.

## B. The Proffer.

Before the second trial, appellant Green presented Dr. Penrod "to testify about the psychological factors affecting memory and perception that may have influenced the bizarre fluctuations in Rodney Givens' testimony" at the first trial. As already recounted above, Givens stated that he did not see any perpetrator in the courtroom during voir dire, even though both appellants were seated at the defense table. On redirect, however, Givens did identify Green as the man who forced McWeay into the back seat of the Oldsmobile, got in the car himself, and ordered Givens to drive away. Givens also had selected two photographs from a police array before trial, one of which was a photograph of Green, but Givens was not able to state with certainty which of the two photos depicted the kidnapper.

Under the proffer, Dr. Penrod would have testified about the following psychological concepts: (1) "unconscious transference," by which a witness who sees a person in one setting might subliminally, and incorrectly, associate that person with another time or place; (2) "photo-biased identifications," in which a witness who sees a photograph of a suspect might be more inclined to make an incorrect identification of that suspect later; (3) the negative effects of stress, fear, and emotion on the accuracy of an eyewitness's memory; (4) similar negative effects of violence or the use of a weapon on an eyewitness's memory; (5) similar negative effects of poor lighting conditions and brief periods of

9. In *State v. Schutz,* 579 N.W.2d 317 (Iowa 1998), the Iowa Supreme Court overruled its 1979 decision that established a per se rule excluding expert witness testimony on eyewitness identification. The court noted that it had found no appellate court other than Iowa that had such a per se rule. *See id.* at 320. It also noted that most of the scientific literature on the subject had been published subsequent to the 1979 decision. *See id.* at 319–20. The *Schutz* court cited a number of recent decisions that upheld the

admission of such expert testimony or even held its exclusion to be an abuse of discretion. *See id.*

10. For example, the typical concerns about eyewitness identification are almost wholly absent in situations where the eyewitness is trained in the art and comes expecting to have to identify an individual, as in undercover drug buys. *See Webster v. United States,* 623 A.2d 1198, 1204 & n. 15 (D.C.1993).

interaction between an eyewitness and a perpetrator on the accuracy of the eyewitness's memory; and (6) the reluctance of an eyewitness who has publicly identified someone to change that identification later, or even to admit doubt. By educating the jury about these concepts, Green hoped to cast doubt on the accuracy of Givens's identification.[11]

## C. The Trial Court's Exercise of Discretion.

The trial court ruled that Dr. Penrod's testimony would not be admitted and explained its ruling orally as follows:

The memorandum filed by [counsel for Green] not only contains Professor Penrod's extensive curriculum vitae, but also sets forth a number of citations to other cases and law review articles and other articles written for scientific or professional journals [by] Professor Penrod and others, talking about the, if you will, state of the art within this particular field, and how, within that field, [it] has changed in the last ten years or progressed from their professional point of view.

So I am not making this ruling without some cognizance of basically what is out there, but rather I am making this ruling based upon my conclusion that this proffered testimony and evidence does not meet the first prong of the *Dyas* three-prong test.

In this particular situation, I frankly think that the question might be more difficult if I were being asked to rule upon a blank canvas, as it were. That is not the situation. I, along with the parties and Counsel, have lived through about three and a half weeks of trial in this case. I

have gone thr[ough] the experience of a number of voir dire examinations held out of [the] presence of the jury, including Mr. Givens, the primary witness against whom this testimony is being offered.

I am also dealing with a situation where Counsel [at the first trial] ... thoroughly and exhaustively explored with Mr. Givens, outside the presence of [t]he jury, and even more so in the presence of the jury, all the circumstances of his in-court identification....

[Counsel for Green] left nothing unturned in cross examining that young man. I don't think there was anything else you ... could have asked him about his identifications. And I think in some respects you made him out to be silly in front of the jury, through the quality of your cross examination.

But the point is, all of those facts were presented to the jury. You've got the transcript from the first trial. I fully expect you will go into this with Mr. Givens again, and ... if he starts to give answers that are different, you obviously not only have the transcript, but you even have exhibits with which to impeach him and make him appear to be changing his testimony....

To propose to bring in an expert now to talk about some scientific studies, professional studies, however you wish to denominate them, done ... in a controlled environment, as opposed to or perhaps in addition to some case studies which are referred to based upon interviews with jurors who served in actual cases, I think is to present information that, number one, is unnecessary to this particular jury that

---

11. Appellant Landon joined Green's motion to admit Dr. Penrod's testimony. Landon hoped to use the testimony to cast doubt on the reliability of the identification of him made by Agent Cooke. Nevertheless, Landon never explained precisely what Dr. Penrod might have to say about Cooke's identification. On appeal, Landon contends that Penrod would have spoken about alleged inaccuracies in cross-racial identifications; Cooke is white and Landon is black. Penrod was not proffered to testify about cross-racial identifications, however and this argument does not appear to have been made to the trial court at any time. The only pleading before the trial

court focused on identifications of Green, and, accordingly, Givens was the focus of the trial court's ruling. If Landon felt that his needs for the expert testimony were not properly addressed by the trial court, then it was incumbent upon him to press the trial court for an explicit ruling. *See Finley v. United States*, 632 A.2d 102, 106 (D.C.1993). As for the more general purposes for which Dr. Penrod actually was proffered, for the reasons we state in the text, the trial court did not commit manifest error in excluding the proffered expert testimony in the context of this trial.

will be hearing this case; and, secondly, [deals] with matters that are not beyond the ken of the average juror.

It is one thing to say[,] in a sort of clean canvas upon which has not been painted upon or drawn upon, that this is what the scientific world believes goes on in terms of eyewitness identifications. To then say to the jury[,] here is what the scientific community says, now let's make the transference without the expert making the transference, but I want you, ladies and gentlemen, to make the transference, if you will, from what goes on in the controlled environment to Rodney Givens, who has been, you know, skewered left and right by Defense Counsel on cross examination, are things which I think are not necessary for the jury's evaluation in this case. I think that the jury is perfectly capable of using their own common sense, their own experiences, and the facts which you bring out on cross examination, to make an evaluation as to [first] whether or not Rodney Givens had any perceptual difficulties; number two, whether those perceptual difficulties have impacted positively or negatively on his identification, and finally to use that common sense and experience in determining how reliable is that identification, independent of whether or not there are even any perceptual abilities or abilities to recall things....

[Defense counsel] made it appear that it was absolutely silly for him [Givens] not to have known that the defendants were going to be in the courtroom and where they would be sitting, and how is it that he had to suddenly stick his head around the corner of the jury box in order to see Mr. Green, and why hadn't he done it before.

All these facts were brought out to the jury, and the jury was in an absolutely perfect position to make an assessment as to what weight, if any, to give to Mr. Givens' testimony.

Given what I have heard in the first trial, and what I have seen, and knowing that there's likely to be a repetition of it which would get even more nasty if he [Givens] tries to change something, I don't see any basis for concluding that this type of proffered expert testimony would deal with the subject matter that is beyond the ken of our average juror and lay person; therefore, the motion is denied.

■ We cannot say that this lengthy oral ruling was manifestly erroneous. The trial court properly exercised its discretion by taking account of the scientific developments identified in the proffer. Then the trial court, similar to its predecessors in *Dyas* and that case's progeny, concluded that the proffered expert testimony did not deal with subject matter beyond the ken of an average juror and would present information unnecessary to this particular jury that would be hearing this case. *See Taylor, supra,* 451 A.2d at 866–67 & n. 9 (concerning stress, reluctance of witness to change publicly-declared identification, and perpetrator's use of a weapon); *Brooks, supra,* 448 A.2d at 258 (concerning "the nature of human memory and perception and the mental processes involved in an eyewitness identification"); *(Michael) Smith, supra,* 389 A.2d at 1358–59 (concerning "the psychology of memory and perception"); *Dyas, supra,* 376 A.2d at 831–32 (concerning stress, reluctance of witness to change publicly-declared identification, and possibility that authority figures might unduly influence the identification process). *See also Commonwealth v. Santoli,* 424 Mass. 837, 680 N.E.2d 1116, 1118–20 (Mass. 1997) (affirming, under abuse-of-discretion standard, the exclusion of expert testimony on the effects of, inter alia, stress, the use of a weapon, and "postevent suggestions" on the accuracy of an eyewitness's identification).

Dr. Penrod's testimony was proffered for two reasons upon which this court has not yet ruled in a published opinion: unconscious transference and photo-biased identifications. Courts of other jurisdictions, however, have held that a trial court's exclusion of expert testimony offered for such purposes is not an abuse of discretion. *See, e.g., United States v. Harris,* 995 F.2d 532, 534–36 (4th Cir.1993) (affirming, under abuse-of-discretion standard, the exclusion of expert testimony on, inter alia, the effects of unconscious transference on the accuracy of an eyewitness identification); *Rodriguez v. Commonwealth,* 20

Va.App. 122, 455 S.E.2d 724, 726–27 (Va.Ct. App.1995) (affirming, under abuse-of-discretion standard, the exclusion of expert testimony on the effects of, inter alia, photo-bias in subsequent in-person identifications). The point of such proffers is always to undermine the reliability of the identification. As the trial court pointed out, defense counsel in this case had ample opportunity to argue to the jury that Givens's identification was influenced by his prior viewing of the photo array and, perhaps, by encounters with Green in other settings, and otherwise to challenge Givens's identification testimony.

Moreover, like the trial court here, we have recognized the importance of cross-examination to emphasize to the jury the eyewitness's equivocations and possible mistakes. *See Taylor, supra,* 451 A.2d at 867; *Brooks, supra,* 448 A.2d at 258; *(Michael) Smith, supra,* 389 A.2d at 1359; *Dyas, supra,* 376 A.2d at 832. The circumstances under which Givens viewed Green on the night of the offenses, the lapse of two years between that night and Givens's first attempt to identify Green, and Givens's equivocation were all made known to the jury through lengthy cross-examination. We note also that the trial court had personally seen the mishaps involving Givens which formed the basis for the proffered testimony, and was in a particularly good position to determine what benefit, if any, expert testimony might provide to explain them.

In short, given the abuse of discretion standard applicable here, we cannot say the trial court erred in excluding Dr. Penrod's testimony for all proffered purposes. We turn now to the appellants' separate contentions.

### IV. IDENTIFYING TWO PHOTOS FROM THE ARRAY.

Appellant Green contends that the trial court erred in admitting evidence that Givens had selected his photo from a police array before trial or, more precisely, had selected two photos, one of which was of Green. He articulates two grounds on which the evidence should have been excluded: reliability and relevance.[12]

Green maintains that the pretrial identification was not sufficiently reliable to be a prior identification, which we have recognized as an exception to the hearsay rule. *See generally Beatty v. United States,* 544 A.2d 699, 701–02 (D.C.1988). Givens, the teenaged driver of the Oldsmobile, had been shown a police photo array before trial consisting of ten photographs and asked to identify the man who rode with him back into Montgomery County with the kidnapped McWeay. He chose photographs of two different people and said that one of them was the kidnapper, but Givens could not narrow his choice to one picture or the other. As between the two, he said, he was not sure. One of these two photographs depicted appellant Green.

■■■■ Green did not object to the admission of the pretrial identification,[13] so we review for plain error. *See Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc). To merit reversal under this standard, the error complained of "must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Id.* A pretrial identification generally is admissible at trial if the identifying witness is available for cross-examination. *See Beatty, supra,* 544 A.2d at 702; *see also* FED.R.EVID. 801(d)(1)(C). In addition to the witness's availability for cross-examination, an important evidentiary consideration is the reliability of the prior identification. *See Beatty, supra,* 544 A.2d at 702; *In re L.D.O.,* 400 A.2d 1055, 1057 (D.C.1979). Givens was in fact cross-examined by both appellants at trial. The only question Green presents on

---

**12.** Green raises only these evidentiary matters; he does not contend that the identification procedures were unduly suggestive, which might raise different concerns. *See Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Sheffield v. United States,* 397 A.2d 963, 967 & n. 4 (D.C.1979).

**13.** Counsel for Green objected at the first trial, which ended in a mistrial when the jury was unable to reach a unanimous verdict, but did not object at the retrial which led to this appeal. The trial judge in this case expressly told counsel for all parties that objections from the earlier trial would not be deemed to "carry over" into the retrial.

this point is whether the reliability of Givens's identification was so inherently suspect that its admission was plain error.

■ We think the identification here was sufficiently reliable to withstand plain-error review.[14] This is not a case where the witness repudiates or otherwise expresses significant doubt at trial about the accuracy of his or her prior selection, as in *L.D.O., supra,* 400 A.2d at 1057 (witness at trial was "not in the least bit positive" of prior identification). Nor is it a case where the prior selection by the witness amounted to no real identification at all, as in *In re R.H.M.,* 630 A.2d 705, 707–08 (D.C.1993) (witness set aside three photos from an array because they "looked familiar"). Here, Givens stated that the kidnapper was one of the two people picked from the photo array; he simply could not state which one.[15]

■ Green's contentions would appear more properly to go to the weight of the prior identification process, that is, whether it met even the minimal requirement of relevance. We are extremely deferential to a trial court's ruling on relevancy, *see, e.g., (William) Johnson v. United States,* 683 A.2d 1087, 1095 (D.C.1996) (en banc), *cert. denied,* — U.S. —, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997); *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977), and we find no basis to disturb its decision here on that ground. Green had narrowed an array of ten photographs down to two and stated one or the other was the kidnapper. At least for purposes of plain error review, we think such an identification tended to make the exis-

tence or nonexistence of a fact, *viz.,* whether Green kidnapped McWeay, more or less probable than would be the case without it, *see Punch, supra,* 377 A.2d at 1358, and there was a wealth of other evidence implicating Green, not the man in the second photograph, in these crimes.

## V. THE CONSPIRACY JURY INSTRUCTION.

Appellant Landon contends that the trial court gave erroneous jury instructions on the elements of conspiracy. Landon had requested the standard eight-page conspiracy instruction that appeared in the then-current third edition of Criminal Jury Instructions for the District of Columbia, No. 4.92, at 298–305 (1978), but the trial court expressed concern that the instruction was too long. Instead, the trial court decided to give a much shorter instruction offered by both the prosecutor and counsel for appellant Green which had been developed by Superior Court Judge A. Franklin Burgess, Jr. Landon did not state any particular reason that he preferred the longer conspiracy instruction but simply registered an objection. Now, on appeal, Landon contends that the so-called "Burgess instruction" omitted an essential element of the offense, *viz.,* that the defendant intended to commit the unlawful objective of the conspiracy. The Burgess instruction, barely more than two pages long, now appears as the recommended conspiracy instruction in the fourth edition of Criminal Jury Instructions for the District of Columbia, No. 4.93 (1993).[16]

---

14. We take no position as to whether its admission over objection would be error.

15. Appellant Green argues that Givens's failure to make an in-court identification during the first trial, in voir dire and on direct examination, further undermines the reliability of his identification from the photo array. However, Givens was able to do so on redirect after the prosecutor indicated that the view from the witness box to the defense table was blocked. Moreover, Givens did make a positive identification on direct examination in the second trial, after he was asked to stand in the witness box for a better view of the entire courtroom.

16. The standard basic instruction on conspiracy contained in the fourth edition reads in its entire-

ty, including optional bracketed language and blank spaces, as follows:

[I am going to tell you about the charge of conspiracy to _____, which is a separate charge from _____ itself [with which the defendant is also charged]. [In deliberating on this charge you must consider each defendant individually, to decide whether the government has proved each of the elements as to that person.]

[The defendant] [Each of the defendants] is charged with conspiring to _____. It is against the law to agree with someone to commit the crime[s] of _____. The government is not required to prove that the objective was achieved. To find [any of] the defendant[s] guilty of the crime of conspiracy, you must be convinced that the government has

## A. Standard of Review.

■■■■■ Under Superior Court Criminal Rule 30, "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating *distinctly* the matter to which that party objects *and the grounds* of the objection." (Emphasis added.) "In other words, objections to jury instructions must be specific enough to direct the judge's attention to the correct rule of law; a party's request for jury instructions must be made with sufficient precision to indicate distinctly the party's thesis." *Russell v. United States*, 698 A.2d 1007, 1012 (D.C.1997). A defendant's failure to raise objections in the manner required by Rule 30 limits the scope of our review to plain error. *See Robinson v. United States*, 649 A.2d 584, 586 (D.C.1994); *see also Watts, supra*, 362 A.2d at 708–09.

■■■ Landon's general objection was neither distinct nor specific enough to preserve this issue for appeal. Rule 30 requires a distinct statement of what was wrong with the instruction and a precise explanation of the grounds for the objection. *See Russell, supra*, 698 A.2d at 1012. The purpose of Rule 30 is "to give the trial court the opportunity to correct errors [in] and omissions" from the charge to the jury, *(Linwood) Johnson v. United States*, 387 A.2d 1084, 1089 (D.C.1978) (en banc), a purpose that is ill-served by a party's unexplained insistence on its own proffered instruction. As the U.S. Court of Appeals for this jurisdiction has held, under the federal version of Criminal Rule 30, "mere objection to instructions without specification of the ground of the objection does not fulfill Rule 30's purpose and is insufficient to satisfy the rule's require-

proved each of the following three elements, beyond a reasonable doubt:

First, that [between _____ and _____ (dates)] an agreement existed between two or more people, to commit the crime of _____. This does not have to be a formal agreement or plan, in which everyone involved sat down together and worked out the details. On the other hand, merely because people get together and talk about common interests, or do similar things does not necessarily show that an agreement exists to _____. It is enough that the government prove beyond a reasonable doubt that there was a common understanding among those who were involved to commit the crime of _____. So, the first thing that must be shown is the existence of an agreement.

Second, the government must prove that the defendant intentionally joined in that agreement. It is not necessary to find s/he agreed to all the details of the crime, or that s/he knew the identity of all the other people the government has claimed were participating in the agreement. A person may become a member of a conspiracy even if that person agrees to play only a minor part, as long as that person understands the unlawful nature of the plan and voluntarily and intentionally joins· in it. [Even if the defendant was not part of the agreement at the very start, s/he can become a member of a conspiracy later if the government proves that s/he intentionally joined the agreement. Different people may become part of the conspiracy at different times.]

But mere presence at the scene of the agreement or of the crime, or merely being with the other participants, does not show that the defendant knowingly joined in the agreement. Also, unknowingly acting in a way that helps the participants, or merely knowing about the agreement itself, without more, does not make the defendant part of the conspiracy. So the second thing that must be shown is that the defendant was part of the conspiracy.

Third, the government must show that one of the people involved in the conspiracy did something for the purpose of carrying out the conspiracy. This something is referred to as an overt act. The government must show that one of the people involved in the conspiracy did one of the overt acts in order to carry out the conspiracy. The charged overt acts are _____. The government need not prove that all of these overt acts were taken, but in order to find the defendant guilty, you must all agree on at least one overt act that was done.

A conspiracy can be proved indirectly, by facts and circumstances which lead to a conclusion that a conspiracy existed. But it is up to the government to prove that such facts and circumstances existed and lead to that conclusion in this particular case.

In deciding whether an agreement existed, you may consider the acts and statements of all the alleged participants. In deciding whether the defendant became a member of that conspiracy, you may consider only the acts and statements of that particular defendant.

In summary, a conspiracy is a kind of partnership in crime. For any defendant to be convicted of the crime of conspiracy, the government must prove three things beyond a reasonable doubt: first, that [during (the charged time period)] there was an agreement to _____; second, that the defendant intentionally joined in that agreement; and third, that one of the people involved in the conspiracy did one of the overt acts charged.

ments." *United States v. Williams,* 172 U.S.App. D.C. 290, 296, 521 F.2d 950, 956 (1975). We think Landon did not adequately alert the trial judge to the rather specific error which he now claims occurred by simply objecting to the Burgess instruction and demanding nothing less than the eight-page alternative. We therefore review for plain error and find none. *See Robinson, supra,* 649 A.2d at 586. Indeed, as will be shown, even if we were arguendo to review the instruction as if the claim of error were properly preserved, we would not reverse.

### B. The Elements of Conspiracy.

In *Gibson v. United States,* 700 A.2d 776, 779 (D.C.1997), we identified three elements of conspiracy:

(1) an agreement between two or more persons to commit a criminal offense; (2) knowing participation in that agreement *with intent to commit the criminal objective;* and (3) during the life of the conspiracy, and in furtherance of its objective, the commission by at least one conspirator of at least one of the overt acts specified in the indictment.

(Emphasis added.) The italicized language dealing with a requisite intent of the conspirator is the element that Landon contends was omitted from the instruction actually given by the trial court.[17]

The longer instruction proposed by Landon and contained in the prior third edition specifically required as an essential element of the offense of conspiracy that "the defendant knowingly participated in this conspiracy, with the intent to commit the offense which was the object of the conspiracy[.]" Criminal Jury Instructions for the District of Columbia, No. 4.92, at 298 (3d ed.1978). Similar language appears in many other definitions of conspiracy. *See United States v. Treadwell,* 245 U.S.App. D.C. 257, 263, 760 F.2d 327, 333 (1985) ("the defendant knowingly participated in the conspiracy with the intent to commit at least one of the offenses charged"); *United States v. Haldeman,* 181 U.S.App. D.C. 254, 335, 559 F.2d 31, 112 (1976) (en banc) (per curiam) ("the specific intent required for the crime of conspiracy is in fact the intent to advance or further the unlawful object of the conspiracy"); *see generally* 2 WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 6.4(e)(1)-(2), at 76–79 (1986) (explaining that conspiracy involves two separate intents, the intent to agree and the intent to achieve the criminal objective).

The conspiracy instruction given in this case, however, described the second element of the offense in the following manner:

[T]he government must prove that the defendant, each defendant, intentionally joined in the agreement. It is not necessary to find that a defendant agreed to all the details of the crime or that a defendant knew the identity of all the other people the government has claimed were participating in the agreement. A person may become a member of a conspiracy even if that person agrees to play only a minor part, as long as that person understands the unlawful nature of the plan and voluntarily and intentionally joins in that plan.

Even if the defendant was not part of the agreement at the very start, a defendant can become a member of the conspiracy later if the government proves that the defendant intentionally joined the agreement. Different people may become part of the conspiracy at different times.

But mere presence at the scene of the agreement or of the crime, or merely being with the other participants[,] does not show that the defendant knowingly joined in the agreement. Also, unknowingly acting in a way that helps the participants or merely knowing about the agreement itself[,] without more[,] does not make the defendant part of the conspiracy.

*See* Criminal Jury Instructions for the District of Columbia, No. 4.93, at 517 (4th ed.1993) (providing virtually identical description). At the end of the instruction, the trial court summarized the second element of

---

17. The importance of a specific objection under Rule 30 is exemplified here. If Landon had properly focused his objection, the trial court could readily have added a sentence or two taken from the prior standard instruction or a relevant case to eliminate any possible argument concerning instructional error as now raised on appeal.

conspiracy as "the defendant intentionally joined in that agreement." *See id.* at 518 (same).

 The issue, then, becomes whether the language in the new model jury instruction adequately instructs on the element of intent that Landon now claims was omitted. When reviewing a jury instruction for an alleged error, this court should consider the instruction as a whole in the context of the entire charge. *See Moss v. Stockard,* 580 A.2d 1011, 1027 (D.C.1990); *Watts, supra,* 362 A.2d at 709; *see also United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975).

 We think the new instruction, when read in context, adequately explained the requirement that Landon intended to commit the unlawful objective here, namely, the robbery of McWeay's cocaine. The trial court instructed the jury on the first element of conspiracy that the government must prove that "an agreement existed ... to commit the crime of robbery.... It is enough that the government prove beyond a reasonable doubt that there was a common understanding ... among those who were involved to commit the crime of robbery...." Thus the "intent" element of conspiracy was partly incorporated into the "agreement" element. The jury was instructed that the purpose of the agreement must be to commit the unlawful object of the conspiracy, and that all participants must share a "common understanding" that their agreement is to commit that crime. As to the second part of the instruction, the "intentionally joined" element of conspiracy, the trial court instructed the jury that "the government must prove that the defendant ... intentionally joined in the agreement" and that "[a] person may become a member of the conspiracy even if that person agrees to play only a minor part, as long as that person understands the unlawful nature of the plan and voluntarily and inten-

tionally joins in that plan." Thus, *in toto,* the jurors were instructed that they had to find both (1) the existence of an agreement to rob and (2) that Landon joined the agreement with an understanding of its objective and with the intent to assist in its accomplishment.

We conclude that, while the instruction may not necessarily be beyond any possible improvement,[18] the jury was adequately told that the defendant must intend to commit the unlawful objective of the conspiracy. To "intentionally join" the agreement in this context necessarily means that the defendant understands the unlawful purpose and wants to join anyway, particularly where the instruction emphasizes that even a minor player could be deemed to join the conspiracy "as long as that person understands the unlawful nature of the plan and voluntarily and intentionally joins in" it. Accordingly, we find no error at all in the instruction on the elements of conspiracy and *a fortiori* no plain error, the standard of review applicable to this appeal.

## VI. LANDON'S REMAINING ARGUMENTS.

Appellant Landon presents several other arguments which may be addressed more summarily. *See supra* note 3.

### A. Reasonable Doubt Instruction.

Appellant Landon challenges the instruction on reasonable doubt but acknowledges that he never objected to it at trial. Therefore we review the instruction for plain error, and we find none. The trial court gave a Maryland pattern jury instruction which had been reproduced approvingly in an opinion by the highest court of that state just a few months before the appellants' trial. *See Wills v. State,* 329 Md. 370, 620 A.2d 295, 301–02 (Md.1993).[19]

---

**18.** *See supra* note 17.

**19.** After describing the presumption of innocence, the trial court in the case before us defined "reasonable doubt" as follows:

A reasonable doubt is a doubt based upon reason. It is not a fanciful doubt, a whimsical doubt or a capricious doubt. Proof beyond a reasonable doubt requires such proof as would

convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs. If you are not satisfied of a defendant's guilt to that extent then reasonable doubt exists and that defendant or defendants—it would then be

Appellant Landon identifies two aspects of the instruction that he contends are reversible errors. First, the trial court substituted the word "belief" for the more traditional phrase in this jurisdiction, "abiding conviction," to describe the necessary depth of a juror's confidence in a defendant's guilt. *See (Darius) Smith v. United States,* 709 A.2d 78, 80 n. 4 (D.C.1998) (en banc) (noting that "abiding conviction" was the prevailing phrase in reasonable-doubt instructions until 1993, when "firmly convinced" gained currency). In a case decided a few months after appellants' trial, we held that replacing the phrase "abiding conviction" with "belief"— even a "strong" or "deep rooted" belief—was error, but not plain error. *See Foreman v. United States,* 633 A.2d 792, 794 (D.C.1993). When reading the instructions as a whole, we reach the same conclusion with respect to Landon's case.[20]

Second, Landon asserts that the trial court erred in telling the jurors that proof beyond a reasonable doubt must be so convincing that *"you* would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs." (Emphasis added.) Landon would have preferred the use of the phrase "a reasonable person" rather than "you." However, we have upheld reasonable-doubt instructions that omit any reference to the reasonable-person standard even over timely objection. *See Newman v. United States,* 705 A.2d 246, 265 (D.C.1997); *Butler v. United States,* 646 A.2d 331, 334–35 (D.C.1994).[21]

### B. The Alleged Misstatement of the Evidence.

Next, appellant Landon contends that the prosecutor misstated the evidence in her opening statement and closing argument when she identified Landon as the man who drove the Blazer out of the gas station and followed Cherrico and Moctar into Cherrico's apartment. As an example of the types of statements to which Landon ascribes error, the prosecutor offered the following narrative in her closing argument: "Ralph Cherrico, in an effort to stay alive, in an effort to survive, convinces Moctar to let him go to his apartment.... They drive there, ladies and gentlemen, and Ralph Cherrico describes the driver of the Blazer as a tall, dark-skinned person. The person who has to be Bernard Landon." Landon maintains that there was no evidence that he drove the Blazer.

Counsel for Landon did not object at either time, so we review the alleged misstatements for plain error.[22] *See Harris v. United States,* 602 A.2d 154, 159 (D.C. 1992) (en banc); *Thacker v. United States,* 599 A.2d 52, 59 (D.C.1991). We start by determining whether the prosecutor's statements were improper. *Harris, supra,* 602 A.2d at 159; *Thacker, supra,* 599 A.2d at 61. In the opening statement, a prosecutor may summarize evidence he or she reasonably expects to present, even if at trial the evidence does not unfold precisely as expected. *See Frazier v. Cupp,* 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). "Closing argument may elicit reasonable inferences from the evidence presented, although it may

---

your duty to find that defendant or defendants not guilty.

20. *Foreman* also disposes of Landon's contention that an erroneous reasonable doubt instruction is reversible plain error under *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). As we noted in *Foreman,* the *Sullivan* Court "had before it no issue of failure of the defendant to object to an instruction." 633 A.2d at 796.

21. Landon also contends that the trial court's use of the phrase "willing to act," rather than "hesitancy to act," is error, but the only case he cites from this jurisdiction held that such a substitution is not reversible plain error. *See Scurry v.*

United States, 120 U.S.App. D.C. 374, 375–76, 347 F.2d 468, 469–70 (1965). We note, however, that our *(Darius) Smith* instruction, which trial judges should use in the future, contains the phrase "hesitate to act." *See* 709 A.2d at 82.

22. Counsel for appellant Green did object during closing argument, after the passage we have reproduced in the text, but the transcript indicates that his concern was whether the driver had been described as "shorter" rather than "tall"—a quite different matter from what Landon himself now raises. The trial court thereupon instructed the jurors that their recollection of the evidence, not counsel's, controls; neither appellant contests the propriety of the trial court's response to Green's objection.

not present new evidence or rely on evidence that has not been presented." *Morris v. United States,* 564 A.2d 746, 750 (D.C.1989).

 As for the opening statement, the prosecutor could reasonably expect to present testimony placing Landon in the Blazer. Landon's grandmother had testified before the grand jury that Landon admitted to her that he was in a Chevrolet during at least one of the shootings. A Blazer is a model of Chevrolet. The prosecutor could reasonably expect the grandmother to give the same testimony at trial, even though, as things turned out, she did not. *See Sterling v. United States,* 691 A.2d 126, 133 (D.C.1997) ("When a witness' prior inconsistent statement is made under oath, it is reasonable to expect that he will repeat the testimony under oath at trial....").[23]

As for the closing argument, placing Landon in the Blazer was a reasonable and even compelling inference from the totality of the testimony at trial. Landon conspired to commit the offense. Givens said he drove Moctar, Green, and a third man—whom the government argues must be Landon—to the gas station, where other evidence indicates that they met McWeay and Cherrico. Barkley placed Landon at that gas station with Green. Cherrico identified Moctar as the man who commandeered the Corvette at the gas station and, eventually, shot him in the head. Givens said appellant Green got back in the Oldsmobile with McWeay and ordered him to drive to suburban Maryland. Meanwhile, as both Cherrico and Barkley testified, *someone* drove the mint green Blazer out of the gas station and followed the white Corvette. According to Cherrico, the Blazer followed him to his apartment and, eventually, to the alley in which Moctar shot him.

The only possible driver remaining from the cast of characters would be Landon. Everyone else involved in the gas-station incident left in another vehicle, except for Barkley and Brown, who had to walk after appellant Green took the Blazer at gunpoint. The best Cherrico could remember about the driver of the Blazer was that he was a dark-skinned African American man, and Landon does not deny that he fits in this quite general category. The inference that Landon drove the Blazer might be particularly compelling because evidence collected later that night clearly linked him to that vehicle. Several hours after the principal offenses took place, Agent Cooke identified Landon as one of three occupants of the Blazer. Although all three fled on foot after Cooke gave chase, the police recovered Landon's fingerprints from the vehicle's interior and also traced the guns that had been thrown from the Blazer to the shootings of Cherrico and McWeay.

In short, we do not think the trial court committed plain error, indeed any error at all, by failing to interrupt the government's opening statement and closing argument, sua sponte, when the prosecutor identified Landon as the driver of the Blazer.

### C. Admitting the Grand Jury Testimony of Landon's Grandmother.

Landon also contends that the trial court committed reversible error when it allowed the government to impeach one of its own witnesses, Grace Keys, with her grand jury testimony. Keys is Landon's grandmother. At the grand jury proceedings, Keys had testified that Landon told her, "I was in the car, but when the gun went off, I jumped out and ran." Keys had specified that "[h]e was in this Chevrolet car"; the Blazer was manufactured by Chevrolet. At trial, however, Keys testified that she visited Landon after his arrest and that he had an alibi: "I didn't do it ... because I wasn't there."

The government claimed surprise at this change in Keys's narrative and requested permission to impeach her with her grand jury testimony. Landon objected that any surprise did not affirmatively damage the government's case and therefore impeachment would be inappropriate. The trial court ruled that the prosecutor could impeach the witness with the grand jury testimony because, among other things, "there

---

**23.** See the following section for a discussion of another problem presented by the grandmother's testimony.

are obviously certain exculpatory statements made, too."

 Whether to allow a party to impeach its own witnesses on a claim of surprise is committed to the sound discretion of the trial judge, whose ruling will not be reversed unless it lacks any rational basis. *See Sterling, supra,* 691 A.2d at 133. The party claiming surprise must demonstrate that the unexpected testimony affirmatively damages its case and that impeachment is necessary to neutralize such damage. *See Hawkins v. United States,* 606 A.2d 753, 758 (D.C.1992). We have upheld a trial court's determination of affirmative damage in this context "when the witness' testimony has tended to injure or destroy the party's case." *Id.*

 As already noted, the government's case was strengthened by placing Landon in the Blazer. The grandmother's surprise trial testimony thus became exculpatory evidence, an alibi. *See Byers v. United States,* 649 A.2d 279, 284–85 (D.C.1994). "Such testimony from a witness called by the government was particularly harmful." *Id.* at 285. We see no abuse of discretion in admitting the grand jury testimony for impeachment purposes.[24]

### D. Forbidding Recross-examination and Denying Motion for Mistrial.

Next, appellant Landon contends that the trial court erred in denying his request for recross-examination of a government witness and, when the request was denied, in denying his subsequent motion for mistrial. Landon had cross-examined Barkley about his telephone conversation with Landon from the police station, the contents of which were memorialized in Barkley's initial statement to the police. On redirect, Barkley refreshed his recollection with the police statement and then testified that when he telephoned Landon from the police station to inquire about his Blazer, Landon had told him that "[t]hey jumped out of the truck and left it."

Landon asked for a clarification of the pronoun "they"—specifically, whether "they" included Landon—but Green objected to such clarification. Landon then asked to re-cross-examine Barkley with the following question: "[I]sn't it true that what you told the police was that Bernard told you that he walked all the way home from Harvard Street and never gave you any indication that he was in that truck at any time[?]" The expected answer would have been "yes," with the implication that "they" must have meant people other than Landon.

The trial court denied the motion for recross for fear that further exploration of this matter would invite speculation and raise evidentiary problems.[25] Instead, to prevent speculation as to what Barkley meant by "they," the trial court halted all further questioning on this matter, struck the "last answer where he talked about them jumping out of the truck" from the record, and instructed the jury to disregard it. Not satisfied with this approach, Landon moved for a mistrial, which the trial court denied "because I am not accepting your basic premise of incurable prejudice."

 There is no right to recross-examine a witness, provided the scope of any redirect examination is limited to matters raised on cross-examination. *See Hilton v. United States,* 435 A.2d 383, 389 (D.C.1981). Whether to allow recross-examination is left to the trial court's "broad discretion." *Woodward v. United States,* 626 A.2d 911, 913 (D.C.1993). Likewise, whether to grant a motion for mistrial is committed to the "sound discretion of the trial court," *(Darryl) Smith v. United States,* 665 A.2d 962, 966 (D.C.1995), which should first take appropri-

---

**24.** We note that in 1995, the statute governing impeachment of witnesses was amended so that prior inconsistent statements, given under oath, may be considered by the jury as substantive evidence. *See* D.C.Code § 14–102(b) (1995 & Supp.1997) (codifying D.C. Law 10–256, § 4, 42 D.C.Reg. 20, 22 (1995)). At appellants' trial, however, the testimony was admitted solely for impeachment purposes. We express no opinion as to whether the grandmother's testimony would be admissible as substantive evidence under the current incarnation of § 14–102.

**25.** In his statement, Barkley had told the police that Landon placed most of the blame for the incident on Green and Moctar, but Barkley apparently thought Landon was lying during that conversation.

ate corrective measures to minimize any potential prejudice before resorting to a mistrial, *see id.* at 966–67. We would reverse the denial of a motion for mistrial only when the trial court's decision is "unreasonable, irrational, or unfair," or "the situation is so extreme that failure to reverse would result in a miscarriage of justice." *Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989).

 We detect no abuse of discretion in either of the trial court's decisions. What Landon may have told Barkley about the Blazer during the telephone call was not a new matter raised for the first time on redirect examination. *See Briggs v. United States,* 525 A.2d 583, 591 (D.C.1987) (holding that a request for an explanation is not a new matter where appellant already had the opportunity to cross-examine the witness about the same statements). Moreover, no mistrial was mandated where the trial judge instructed the jury to disregard this ambiguous and relatively innocuous testimony. As has been frequently repeated, a jury is presumed to follow the trial judge's instructions. *See, e.g., Harris, supra,* 602 A.2d at 165.

### E. The Sufficiency of the Evidence.

Finally, Landon contends that the evidence was insufficient to sustain any of his fourteen convictions. We apply the familiar and oft-stated standard. " 'In evaluating a claim of evidentiary insufficiency, we must view the evidence in a light most favorable to the government, recognizing the jury's province to weigh the evidence, determine the credibility of witnesses, and make justifiable inferences from the evidence.' " *Sterling, supra,*

691 A.2d at 131 (quoting *Peterson v. United States,* 657 A.2d 756, 760 (D.C.1995)).

 We note that the jury was instructed to consider aiding and abetting as to all counts of the indictment except for the conspiracy count.[26] If the evidence was sufficient to convict Landon under an aiding and abetting theory, then we must affirm his convictions even if the evidence might have been insufficient to convict him as a principal. *See Griffin v. United States,* 502 U.S. 46, 49–51, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (conviction will be affirmed if supported by either of two alternate theories). "The oft-recited elements of aiding and abetting are: (1) that the offense was committed by someone, (2) that the accused participated in the commission, and (3) that he did so with guilty knowledge." *West v. United States,* 499 A.2d 860,.865 (D.C.1985). "While mere presence at the scene of a crime is insufficient to establish criminal participation in the offense, proof of presence at the scene of a crime plus conduct which designedly encourages or facilitates a crime will support an inference of guilty participation in the crime as an aider and abettor." *Jefferson v. United States,* 463 A.2d 681, 683 (D.C.1983) (per curiam).

 Under the standard of review stated above and considering the totality of the evidence in this case, much of which has been set forth in this opinion, we are quite satisfied that the evidence supports each of the fourteen convictions. However, as the government acknowledges, not all the convictions can survive. The kidnapping convictions were rendered under alternate theories of intent, so they must merge. More precisely, the four kidnapping convictions must be reduced to two such convictions.[27] *See*

---

**26.** In this appeal, the government does not argue that the substantive convictions should stand under a *Pinkerton* theory, i.e., a conspirator's vicarious liability for any substantive crimes committed by a co-conspirator in furtherance of the conspiracy. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Erskines v. United States,* 696 A.2d 1077, 1080–81 (D.C.1997) (discussing the difference between aiding and abetting and *Pinkerton* liability).

**27.** Landon also argues that finding him guilty of kidnapping McWeay with intent to assault constitutes a constructive amendment of the indictment, which charged kidnapping with intent to kill that particular victim. This argument may

be moot in light of the necessity to vacate one set of the kidnapping convictions on remand. In any event, the indictment was not constructively amended by the language in the verdict form. "[A]n allegation of the particular purpose for which a kidnapping was carried out is surplusage. An indictment's specification of the particular purpose for a kidnapping carries no 'legal significance.' " *Erskines, supra* note 26, 696 A.2d at 1079 n. 2 (citations omitted).

Landon also claims that the convictions for armed mayhem and AWIKWA merge, but we have long recognized that such convictions do not merge even though they may arise from a

*Thorne v. United States*, 471 A.2d 247, 248 (D.C.1983) (per curiam) (holding that two burglary convictions merged when rendered under alternate theories of intent). Likewise, the premeditated murder and the three felony murder convictions must be reduced to a single murder conviction. A defendant cannot remain convicted of premeditated murder and felony murder of the same decedent, nor of both felony murder and the underlying felony. *See Parker v. United States*, 692 A.2d 913, 918 n. 9 (D.C.1997).[28]

Therefore, we remand Landon's case to permit the trial court to determine which counts should merge with others and resentence accordingly to "allow[ ] the trial court to effectuate its original sentencing plan without violating the Double Jeopardy Clause." *Garris v. United States*, 491 A.2d 511, 514 (D.C.1985). Appellant Green correctly makes the same merger argument with respect to his murder and kidnapping convictions; his case, too, is remanded for this purpose. In all other respects, the judgments are

*Affirmed.*

single shooting. *See Bridgeford v. United States*, 411 A.2d 633, 635 (D.C.1980).

28. If the premeditated murder conviction remains as the murder conviction, the felony murder convictions will be vacated but the underlying felonies will stand. If one of the felony murder convictions remains as the murder conviction, the underlying felony of that murder will be vacated, but the other underlying felonies will stand. *See Bonhart v. United States*, 691 A.2d 160, 164 (D.C.1997).